Roberta PRICE, Plaintiff,

v.

PUBLIC SERVICE COMPANY OF
COLORADO, Defendant.

No. Civ.A. 92–K–2285.

United States District Court,
D. Colorado.

April 3, 1998.

Daniel F. Lynch, Denver, CO, for plaintiff.

Glenn H. Schlabs, Sherman & Howard, Colorado Springs, CO, for defendant.

MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

## I. INTRODUCTION

This matter is before me on Defendant Public Service Company of Colorado's (PSC's) Motion for Partial Summary Judgment filed October 10, 1997, pursuant to Fed. R.Civ.P. 56. Plaintiff Roberta Price asserts claims for sexual harassment, age discrimination, retaliation, and wrongful termination. At issue are: (1) Price's claim of sexual harassment pursuant to 42 U.S.C. § 2000e, *et seq.;* and (2) Price's pendent claim that promissory estoppel under Colorado common law precluded her termination. The motion is granted in part and denied in part.

## II. PROCEDURAL BACKGROUND

Price filed this action against PSC on November 6, 1992, in Colorado state court for sex discrimination, sexual harassment, retaliation, and age discrimination under Title VII of the 1964 Civil Rights Act, *as amended,* 42 U.S.C. § 2000e, *et seq.,* as well as for state common law breach of contract and promissory estoppel. The action was removed to this court based on federal question jurisdiction, 28 U.S.C. § 1331, with state law claims being subject to supplemental jurisdiction under 28 U.S.C. § 1367. The case was initially assigned to Judge Daniel B. Sparr.

On April 26, 1994, Judge Sparr granted PSC's motion for summary judgment on all of Price's claims except for the Title VII claim for sexual harassment based upon a continuing course of conduct while she was employed at PSC. On December 20, 1994, Judge Sparr recused himself and the case was reassigned to Chief Judge Richard P. Matsch, who granted Price's request for a *de novo* review of Judge Sparr's ruling on PSC's motion for summary judgment. Upon this review, Chief Judge Matsch found no just reason for delay and on August 1, 1995, directed that, pursuant to Fed.R.Civ.P. 54(b), judgment would enter on all claims, with the exception of the sexual harassment claim.

Price appealed the grant of summary judgment on her wrongful discharge claims based on age discrimination and retaliation and sought leave to pursue her state law claim of promissory estoppel. She failed to appeal the dismissal of her claims for sex discrimination and breach of contract. On June 19, 1996, the Tenth Circuit Court of Appeals reversed summary judgment on Price's age discrimination and retaliation claims and remanded the issue of the promissory estoppel claim to this court with instructions to exercise its discretion as to whether Price should be allowed to amend her complaint on this claim.

On October 11, 1996, Chief Judge Matsch ordered Price to file an amended complaint incorporating her additional allegations supporting the promissory estoppel claim. On October 22, 1996, Price filed an Amended

Complaint which consisted of a single claim of promissory estoppel with the intention that it be added to or incorporated into the original complaint. Pursuant to Fed.R.Civ.P. 12(b)(6), PSC filed a motion to dismiss Price's promissory estoppel claim for failure to state a claim. On December 20, 1996, the case was reassigned to me.

On February 12, 1997, PSC filed additional authority to support its motion to dismiss, attaching the decision of the Colorado Court of Appeals in *Soderlun v. Public Service Company of Colorado*, 944 P.2d 616 (Colo. App.1997). On March 6, 1997, I issued a Memorandum Opinion and Order on Motion to Dismiss Amended Complaint, denying PSC's motion to dismiss. In denying the motion, I addressed the *Soderlun* case and stated, "the lesson in *Soderlun* is that each statement on which a plaintiff relies must be examined to determined whether it satisfies the requisite specificity to enable the court to understand the obligation assumed and enforce the promise according to its terms." Accordingly I concluded that a determination of whether any statement made to Price was a statement upon which she could have actionably relied must await development of the factual record. Price subsequently filed an Amended Complaint of April 16, 1997. The parties completed discovery on September 29, 1997. PSC filed the subject motion on October 10, 1997. Price responded on November 3, 1997. PSC has not submitted a reply.

### III. FACTUAL BACKGROUND

Price was employed by PSC from August 1977 until she was laid off on November 7, 1991. (Am.Compl. Apr. 16, 1997, ¶¶ 1, 15.) Eighteen other employees were laid off by PSC on the same day, (Def.'s Br.Supp.Mot. Part.Summ.J., Ex. C at 210.) Before her employment at PSC, Price was offered a position with IBM in Boulder. (Pl.'s Resp. Mot.Part.Summ.J. Ex. 2 at 421–22.) Price's father, a former vice president of PSC, arranged an interview for her with PSC. (*Id.* at 421.) During the course of the interview, Price was informed that although the salary would be lower than that in the IBM offer, PSC did not lay off workers. (*Id.* at 431.)

Meaning then, a tradeoff of greater job security for a lower wage was allegedly offered by PSC.

Price also claims a general corporate policy at PSC eschewed layoffs. The historical culture of PSC is reflected in its practice of seeking rate increases from the Public Utilities Commission in times of budget shortfalls rather than looking to cut costs. (*Id.* at 444.) At her initial interview, Price was told there had never been layoffs at PSC. (*Id.* at 431.) This policy manifested itself in statements of supervisors and fellow employees referring to certain employees who continued to draw a paycheck, but no longer pulled their weight, as "retired in place." (*Id.* at 471–74.)

Price asserts, during the course of her fourteen year tenure at PSC, she repeatedly complained to supervisors of sexual harassment, discrimination, and inequities in pay and promotion. (Pl.'s Resp. Mot.Part.Summ.J. at 10.) She maintains PSC, in response to these complaints, repeatedly guaranteed her secure employment until retirement as well as a comfortable retirement package if she would acquiesce and abandon her complaints. (*Id.*, Ex. 2 at 479–80.)

Price chiefly relies on the alleged promissory statements of Clark Stephens, Gary Peterson, Pat McCarter, Alan Albrant, Bruce Farrington, Ken Fuller, Bill Martin and Phil Criste, each of which I discuss below.

### IV. APPLICABLE STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). One of the principal purposes of summary judgment is to dispose of factually

unsupported claims, and Rule 56(c) should be interpreted in a way that allows it to accomplish this purpose. *Id.* at 323–24. There are no genuine issues for trial if the record, taken as a whole, would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party bears the initial burden of showing the absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. If the moving party meets this burden, the burden shifts to the nonmoving party. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). The court should view the record in the light most favorable to the nonmoving party, but the nonmoving party "may not rest on the mere allegations or denials of his pleadings." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party must provide specific facts showing a genuine issue of material fact as to the essential elements of his case in order to survive the motion. *Matsushita*, 475 U.S. at 586–87; *Bacchus*, 939 F.2d at 891. The nonmoving party's identification of facts "must be based upon personal knowledge and set forth facts that would be admissible into evidence; conclusory and self-serving affidavits are not sufficient." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir.1991).

At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

## V. MERITS

### A. Sexual Harassment Claim

With respect to this claim it is clear that no material facts are at issue. As such, summary judgment is proper.

To bring a claim in federal court, and thereby receive relief ·of any kind, including injunctive relief authorized for violation of Title VII, a plaintiff is subject to the requirement of standing. U.S. Const. art. 3, § 2, cl. 1; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). "A plaintiff has standing when (1) she has suffered an injury in fact, (2) there is a causal connection between the injury and the conduct complained of, and (3) it is likely that the injury will be redressed by a favorable decision." *United States v. Colorado Supreme Court*, 87 F.3d 1161, 1164 (10th Cir.1996).

"In order to satisfy the redressability requirement … a plaintiff must show that there is at least a 'substantial likelihood "that the relief requested will redress the injury claimed." '" *Baca v. King*, 92 F.3d 1031, 1036 (10th Cir.1996), *quoting Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 75 n. 20, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). Accepting, only as it relates to her sexual harassment claim, that Price has suffered an injury which was connected to the conduct of which she complained, she must still show that relief is available to remedy this claim. She has not shown there is any relief available to redress her sexual harassment claim, much less a "substantial likelihood" of redressability.

The Amended Complaint prays for relief in the form of compensatory damages, punitive damages, back pay, reinstatement, front pay in lieu of reinstatement, declaratory relief, and attorney fees and costs. (Am.Compl. Apr. 16, 1997 at p. 11.) The sexual harassment claim is based upon events that occurred before the passage of the Civil Rights Act of 1991, 42 U.S.C. § 1981a, enacted November 21, 1991, which amended Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e *et seq.* The 1991 Act for the first time provided for compensatory and punitive damages for violations of Title VII. 42 U.S.C. § 1981a(a) and (b). The Court in *Landgraf v. USI Film Products*, 511 U.S. 244, 286, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), ruled that the provisions for compensatory and punitive damages in the 1991 Act did not apply retroactively. *See also Steinle v. Boeing Co.*, 24

F.3d 1250, 1251 (10th Cir.1994). Before the 1991 amendments to Title VII, the only relief for violations of its provisions was equitable in nature. 42 U.S.C. § 2000e–5(g).

Price's employment with PSC ended on November 7, 1991. Therefore, she is ineligible to claim relief in the nature of compensatory or punitive damages under the 1991 Act. Additionally, nominal damages are also considered compensatory in nature and therefore are unavailable to Price. *See Griffith v. State of Colorado, Division of Youth Services,* 17 F.3d 1323, 1327 (10th Cir.1994).

Price does not claim that the alleged sexual harassment in any way affected her salary or compensation, nor that it was somehow the cause of her discharge. Therefore, her requests for back pay, reinstatement, or front pay in lieu of reinstatement are all inappropriate and inapplicable as remedies for her specific claim of sexual harassment.[1] Further, declaratory relief is an anticipatory remedy and inapplicable as Price is not alleging any future harm.[2]

■ As Price is no longer employed by PSC and does not represent a class, any injunctive relief enjoining future sexual harassment would not be personal to Price and would not "aid her in the slightest." *See*

*Alexander v. Yale University,* 631 F.2d 178, 184 (2d Cir.1980). Therefore, Price's has no standing to pursue the sexual harassment claim and judgment will be entered accordingly.[3]

## B. Promissory Estoppel Claim

I note that Judge Sparr's entry of summary judgment against Price on her promissory estoppel claim was not based upon the facts at issue here. Price's original complaint failed to allege reliance on any promises by her employer. Judge Sparr denied Price's request to amend her complaint to include further allegations, believing any amendment to be futile. Because Chief Judge Matsch did not address the estoppel issue in his *de novo* review of the summary judgment motion, the Court of Appeals remanded with instructions to determine whether to allow amendment of the estoppel claim. Judge Matsch allowed this amendment and a second round of discovery, limited to the estoppel issue, ensued. Following this discovery, Price alleged additional facts which I find rise to the level of a prima facie case.

■ The presumption in Colorado is that an employee hired "for an indefinite period of

---

1. It is difficult to surmise how a claim of sexual harassment could ever be remedied by back pay, reinstatement, or front pay as such a claim addresses only the conditions of the work environment and not the compensation or actual employment status of the employee. These remedies might be appropriate if there are accompanying claims of sexual discrimination, constructive discharge or retaliation, in which case such remedies would be for those claims of discrimination, retaliation or constructive discharge, and not for sexual harassment. In the present case there is a claim for retaliation and its relation to the present analysis is addressed in note 3 below.

2. Nor can she claim a future harm, being no longer employed by PSC.

3. Price recognizes that she is not entitled to any relief for her claims of sexual harassment under Title VII as it applies to her cause of action. (Pl.'s Mot.Dir. Entry J.F.R.P. [sic] 54(b) and Vac. Trial Date or Final J. ¶ 5.) She is concerned, however, about the ability to prove her claim of retaliatory discharge without proving an attendant claim of sexual harassment. At this point it is appropriate to highlight the distinction between two separate causes of action.

Courts have generally recognized claims and provided relief for sexual harassment under Title VII as either *quid pro quo* harassment or hostile environment harassment. *See generally* 1 Alba Conte, *Sexual Harassment in the Workplace* § 3.21–22 (1994). Retaliation is a separate claim available under Title VII wherein an adverse employment action is alleged as a result of statutorily protected opposition or participation. *Id.* § 3.28. Often the retaliation claim is based upon employer reaction to sexual harassment complaints. However, a retaliation complaint "may succeed despite a finding that no [antecedent] violation of Title VII has occurred." *Id.*

PSC states that "Plaintiff's Counsel has confirmed that Plaintiff does not allege her termination was related to a claim of sexual harassment." (Def.'s Br.Supp.Mot.Summ.J. at 12 n. 9.) However, Price's response to this motion makes clear that her complaints about alleged sexual harassment are integral to her retaliation claim. The exclusion of Price's sexual harassment claim in no way affects her ability to present relevant evidence in support of her retaliation claim in so far as this claim is based on retaliation for her complaints about an alleged continuous pattern of sexual harassment. Any question as to the relevance of such evidence must await trial.

time is an 'at will employee' whose employment may be terminated by either party without cause and without notice, and whose termination does not give rise to a cause of action." *Continental Air Lines, Inc. v. Keenan*, 731 P.2d 708, 711 (Colo.1987). However, under certain circumstances, this "at will" presumption is rebuttable, including via a theory of promissory estoppel. *Id.* at 711–712.

▮ The elements of a claim for promissory estoppel are:

(1) a promise which the employer should reasonably have expected the employee to consider as a commitment from the employer; (2) reasonable reliance to the employee's detriment, demonstrated by action or forbearance by the employee, induced by the promise; and (3) the existence of circumstances such that injustice can only be avoided by enforcement of the promise.

*Keenan*, 731 P.2d at 712; *Chidester v. Eastern Gas and Fuel Assoc.*, 859 P.2d 222, 224 (Colo.App.1992), *cert. denied* (Oct. 4, 1993).

In the circumstances of this case, Price must demonstrate that: (1) PSC should reasonably have expected her to consider the oral statements by her supervisors as a commitment from PSC; (2) she reasonably relied upon these statements to her detriment through some action or forbearance of action; and (3) injustice can only be avoided by enforcement of PSC's promises. In *Soderlun*, the court noted the additional requirement that the statement by the employer must be "sufficiently definite to allow the

court to understand the nature of the obligation undertaken." 944 P.2d at 621; *see also Vasey v. Martin Marietta Corp.* 29 F.3d 1460, 1464 (10th Cir.1994) (definiteness required in the context of implied contract rather than promissory estoppel).[4]

### 1. Was it reasonable to conclude the existence of a promissory intent or commitment by PSC?

PSC argues it would have been unreasonable for it to believe that Price would conclude that any of the statements by her supervisors proffered a commitment because, as she has always conceded, PSC had the right to terminate "for cause." (Def.'s Br. Supp.Mot.Part.Summ.J. at 13 n. 10; *see also* Am.Compl. Apr. 16, 1997, ¶ 24.) It cites numerous cases which have held that layoffs for economic reasons can constitute termination for good cause.[5] The *Soderlun* court noted, however, that, although a promise never to engage in an involuntary layoff is "extraordinary," there is "no legal barrier to an employer agreeing to restrict its right to terminate employees ..." by foreswearing layoffs as a business option to reduce costs. 944 P.2d at 620. Thus, in considering any cause argument I must determine whether any promise was made and the substantial definiteness thereof.

▮ Price claims that from the time of her initial job interview with PSC until the day of her termination, her supervisors repeatedly assured her that PSC had a "no-layoff" poli-

---

4. Price's opposition brief does not set forth the test for a valid promissory estoppel claim announced in *Continental* and further delineated in *Soderlun*. The requirement of a reasonable expectation by the employer that the employee would consider its promise a commitment is qualified in *Soderlun* to include the additional condition that the statement must be sufficiently definite to allow a court to understand the nature of the obligation undertaken. Price argues only that the statements allegedly made to her are sufficiently definite for this court's consideration. The bulk of Price's argument is a further explication of the alleged facts and an appeal for relief due to the equitable nature of a promissory estoppel claim in general. ("Plaintiff submits 14 years of reliance constitutes an equitable barrier to a change of position by an employee [sic]. Surely, the equities which underlie the doctrine of promissory estoppel become fully operative

long before that time." (Pl.'s Resp. Mot.Part.Summ.J. at 10–11.))

5. Price attempts to distinguish these cases on the grounds that PSC was "a regulated monopoly which was guaranteed a reasonable return on its investment," while the businesses involved in the cited cases were all "for profit." (Pl.'s Resp. Part.Mot.Summ.J. at 5.) Without addressing the accuracy of that proposition (one case seems to involve a regulated rural electric utility, *Zoerb v. Chugach Elec. Ass'n. Inc.*, 798 P.2d 1258 (Alaska 1990)), there is always the possibility that even a regulated monopoly's investment would be considered unreasonable by its regulator and a request for a rate increase denied, a consequence of which might be a necessity to reduce costs, including a possible reduction in its workforce.

cy. This policy, she maintains, was not formally adopted or written in any employee manual, but was a "corporate culture" that was regularly reinforced by oral statements from supervisors. Notably, "there is no analytical difference between a written statement in a handbook distributed to employees and an oral statement made by one in authority directly to an individual." *Id.* at 621.

■ The court in *Soderlun* noted that since "any such policy would have to be unilaterally adopted, it could have been amended by PSC without liability, provided" its employees were notified.[6] *Id.* at 622. Although PSC does not specifically argue this point,[7] the record shows that Price was aware that "some type of release" was posted on a bulletin board in which PSC warned there might be layoffs.[8] (Pl.'s Resp. Mot.Part.Summ.J., Ex. 2 at 441–43.) Price states she at no time saw the memo, but learned about it in a meeting when Bill Martin, the Vice President of her division, flatly denied there would be any layoffs. (*Id.* at 442.)

*Soderlun's* determination on this point is dispositive here as well. Notice was provided to the employees and it is undisputed that Price herself was aware of the possibility of a

reduction in force. Such notice is enough to amend a corporate policy adopted by PSC to eschew layoffs. *Soderlun,* 944 P.2d at 622; *see Ferrera v. Nielsen,* 799 P.2d 458, 460 (Colo.App.1990). The oral assurances of Martin, notwithstanding his status, are insufficient to countermand the contemporaneously stated written policy of PSC, and, at best, constituted an attempt at morale boosting.

PSC next argues that "the promises allegedly made to Price are virtually identical to those which courts have repeatedly rejected as failing to meet [the] standard" of a reasonable conclusion of promissory intent. (Def.'s Br.Supp.Mot.Summ.J. at 18.) PSC cites statements in several cases in which general expressions of long term job security and promotion were found not to supplant the at-will status.[9] It does not attempt, however, to compare the statements allegedly made by its supervisors with those at issue in the cases cited.

■ Price, while agreeing with PSC's statement of the facts, notes that her brief cites these statements "somewhat more fully than were stated in [PSC's] brief."[10] (Pl.'s Resp.Part.Mot.Summ.J. at 1.) The testimony of a party or witness should not be measured solely on one statement, but viewed in its

6. The *Soderlun* case involved a suit against PSC for wrongful termination arising from the same round of layoffs in which Price was terminated. PSC incorrectly asserts that the plaintiffs in *Soderlun* were employees let go when the Fort St. Vrain nuclear power plant was shut down several years prior. (Def.'s Br. Supp.Mot.Part.Summ.J. at 8 n. 8; Pl.'s Resp. Mot.Part.Summ.J., Ex 2 at 465–66 (the shutdown occurred in the mid 1980's).) In fact the *Soderlun* plaintiffs were laid off during the same reduction in force as Price. *Soderlun,* 944 P.2d at 618 (noting plaintiffs were laid off in the "fall of 1991"). Judgment was eventually entered against the plaintiffs on all claims.

7. PSC claims that because Price was aware of the Fort St. Vrain plant shutdown, she cannot claim a reasonable belief in any promises allegedly made by PSC. (Def.'s Br. Supp.Mot.Part.Summ.J. at 16.) Price contends, however, that the Fort St. Vrain closure did not result in any layoffs. She claims that positions were found for employees in other divisions of PSC, or in other corporations, and that those who left PSC did so voluntarily. (Pl.'s Resp. Mot.Part.Summ.J. at 11.) Any conclusion drawn from an analysis of these positions would be tenuous because of PSC's incorrect belief that

the *Soderlun* case, which specifically involved layoffs of PSC employees, was a result of the Fort St. Vrain closure. It is unclear therefore whether any layoffs did occur as a result of the Fort St. Vrain incident.

8. The *Soderlun* court noted that the president of PSC sent a letter to every employee warning of the possibility of layoffs. 944 P.2d at 618. This fact was undisputed by the parties in that action and the court went on to hold that any claims relying on a general policy had no basis. *Id.* at 622. The court examined further only claims that specific promises had been made by individual supervisors. The proposition that each employee was personally notified of looming layoffs is not argued by PSC in the present case.

9. *See Snyder v. Ag Trucking, Inc.,* 57 F.3d 484, 489 (6th Cir.1995); *Vancheri v. GNLV Corp.,* 105 Nev. 417, 777 P.2d 366, 369 (1989); and *Rhoads v. Wal–Mart Stores, Inc.,* 83 F.3d 433, 1996 WL 194854 (10th Cir.1996) (unpublished opinion).

10. Price not only cites the quotations more fully, but attaches portions of her deposition transcript which allow for the statements to be viewed in context. (*See* Pl.'s Resp.Part.Mot.Summ.J., Ex. 2 .)

entire context. *McBride v. Jones*, 615 P.2d 431, 434 (Utah 1980); *see also Olson v. State Highway Commission of Kansas*, 235 Kan. 20, 679 P.2d 167, 174 (1984) (error to consider only isolated, abstract statements taken out of context). Accordingly, Price's contextual explication of the statements at issue is important in considering their import.

■ Out of context, isolated statements made by Price's supervisors might not appear to rise to the level of promises generally recognized by the law as having promissory intent worthy of justifiable reliance. However, "[a]s to establishing the requisite promise, ... the totality of the circumstances determines the nature of the contract. Agreement may be shown by the acts and conduct of the parties, interpreted in the light of the subject matter and of the surrounding circumstances." *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373, 388 (1988) (internal quotations and citation omitted).

PSC argues *Soderlun* should control because the alleged promises to the plaintiffs therein are the same as Price now alleges. That case is distinguishable on its facts, however, as none of alleged promises was made to induce any action or forbearance by those plaintiffs. When viewed in context, several of the statements attributed to PSC supervisors can be construed reasonably as intentional solicitations of Price's acquiescence and compliance with respect to her sexual harassment, discrimination, and equal pay and promotion complaints.

**a. Were the alleged statements by PSC sufficiently definite to allow an understanding of the obligation undertaken?**

■ If the evidence as to whether an enforceable promise was made is "conflicting or will admit of more than one inference ... the issue is one for the jury. If, on the other hand, the evidence discloses only a 'vague assurance,' rather than a legally enforceable promise, then the court must determine the issue as a matter of law." *Soderlun*, 944 P.2d at 621 (citations omitted). PSC again cites several cases from this and other jurisdictions in which employer promises were found too indefinite to enforce. (Def.'s Br. Supp.Mot.Part.Summ.J. at 20–21.) Without comparing those promises with the statements at issue here, however, PSC makes a facile statement that the latter are vague and indefinite, entitling it to summary judgment as a matter of law.

■ PSC argues promises of lifetime employment and/or employment until retirement are for periods of "no definite end or duration and, thus, [such promises] could not properly have been relied on by [Price]." (Def.'s Br.Supp.Mot.Part.Summ.J. at 20.) It cites several cases, since overruled, in which courts of the sixth circuit made inaccurate generalizations about Ohio law on employment contracts and promissory estoppel.[11] In Colorado, as in Ohio, courts recognize the ability to contract for permanent employment. *Soderlun*, 944 P.2d at 621; *Pittman v. Larson Distrib. Co.*, 724 P.2d 1379, 1383 (Colo.App.1986). Permanent employment can include "employment for life, until retirement, until the employee leaves voluntarily, so long as the employee performs satisfactorily, or so long as the employer remains in business." *Pickell v. Arizona Components Co.*, 902 P.2d 392, 397 (Colo.App.1994), *rev'd on other grounds*, 931 P.2d 1184 (Colo.

11. See, e.g., *Fallis v. Pendleton Woolen Mills, Inc.*, 866 F.2d 209 (6th Cir.1989) (holding "reliance on a purported promise of employment until retirement must be construed as insufficient to meet the requirements of promissory estoppel"); *Humphreys v. Bellaire Corp.*, 764 F.Supp. 489, 494 (S.D.Ohio 1991), aff'd. 966 F.2d 1037 (6th Cir.1992) (holding "when an employer promises an employee permanent employment or employment until retirement, any reliance on such promises would be unreasonable"). In its affirmance of *Humphreys*, the Sixth Circuit Court of Appeals specifically addressed and reversed this holding of the district court, as well as that in *Fallis*, as an inaccurate statement of Ohio law. The Court of Appeals found the Ohio Supreme Court decision in *Helmick v. Cincinnati Word Processing*, 45 Ohio St.3d 131, 543 N.E.2d 1212, 1217 (1989) ("A demonstration of detrimental reliance on specific promises of job security can create an exception to the employment at will doctrine."), controlling and concluded that reliance on a promise of permanent employment therefore might be considered reasonable and support a claim of promissory estoppel. *Humphreys*, 966 F.2d at 1042.

1997).[12] *Soderlun*, in addressing the reasonableness of reliance on promises of permanent employment, contemplated the possibility that promissory estoppel could be used to rebut the presumption of an at-will employment relationship. 944 P.2d at 619. Thus, PSC's argument fails.

### b. Were PSC's alleged statements sufficiently definite so as to be construed reasonably as having promissory intent such that PSC should have expected Price to consider them commitments?

Price alleges specific instances, beyond the general policy via culture, where promises of permanent employment were made to her and upon which she relied. To analyze whether PSC had the requisite promissory intent or commitment to overcome the presumption of an at-will employment relationship, I review each of the statements at issue, within its proper context. I consider the promissory intent and definiteness of each statement as a threshold requirement before considering the additional requisite analysis of the reliance and injustice factors.

### (i) Clark Stephens

■ Clark Stephens was a supervisor in the human resources department at PSC who contacted Price in 1977 and invited her to interview. (Pl.'s Resp.Part.Mot.Summ.J., Ex. 2 at 421–23.) This interview had been arranged by Price's father, a former Vice President of PSC. (*Id.* at 421.) At this time Price had already accepted an offer from IBM, but decided nevertheless to interview with PSC. (*Id.* at 421–22.) During the interview, Stephens told Price:

Public Service was a monopoly; that they did not pay as well as other companies but they did not have layoffs, they did not fire employees unless there was—he said he could only remember two times when somebody was fired and that was [sic] both for stealing money. They were both cashiers. He said we can afford to keep our people through good times and bad and asked me if I needed stability of a job with my kids being college age soon. And he

suggested that IBM, though they were a good company, did lay off, and that with Public Service, I'd have a job until I retired.

(*Id.* at 431.) Price confirmed through her father that in his forty-five year career with PSC there had not been any layoffs. (*Id.* at 432–33.) On the basis of Stephen's representations, Price declined the IBM job, although it allegedly paid 25% more, and accepted a position with PSC. (*Id.* at 416.)

As was determined by the court in *Soderlun*, such statements are simply "general assurances of a secure job ... which are neither promissory in nature nor sufficiently definite to be capable of judicial enforcement." 944 P.2d at 622–23. Stephen's statements that there had never been layoffs, and that in his experience only two people had been fired (for substantial cause), were only "descriptions of past history." *See id.* at 623. His further statements, concluding that Price would "have a job until [she] retired" were only "forecasts of [Price's] future progression, or vague assurances of employment stability." *See id.* Generally, such statements are made in an interview to assure the prospective employee of a good working environment and fair treatment by an employer. Absent evidence of a sufficiently definite negotiation over terms, no additional promissory weight can be attributed to statements of this nature.

■ Assuming Stephens' employment offer could be construed as a promise of permanent employment, Price can nevertheless show no reliance to her detriment on such an offer. In reaching this conclusion, I note that the employment relationship is to be considered according to the traditional concepts of the common law of contracts. *See Soderlun*, 944 P.2d at 619. The concept of promissory estoppel runs parallel to that of an express contract: a statement reasonably expected to be considered a promise is the counterpart to an offer; reliance to one's detriment is the counterpart to acceptance and consideration. *Id.; see, generally* 3 Eric M. Holmes, *Corbin on Contracts* § 8.1 (rev.

---

**12.** Even oral arrangements do not necessarily violate the statute of frauds because any of the

events could occur within one year of the agreement. *Pickell,* 902 P.2d at 397.

ed.1996). It is instructive therefore to compare case law concerning the necessity of "special consideration" in contracts for permanent employment with the reliance required to enforce a promissory estoppel claim.

■ A contract for permanent employment is no more than employment terminable at will unless there is an express stipulation as to duration or special consideration. *Pittman*, 724 P.2d at 1383; *see also Beeler v. H & R Block of Colorado, Inc.*, 487 P.2d 569, 573 (Colo.App.1971). Special consideration may include accepting a decrease in salary, relinquishing other guaranteed employment, releasing claims against the employer, or providing the employer with expertise and customer contacts. *Schur v. Storage Tech. Corp.*, 878 P.2d 51, 54 (Colo.App.1994); *Pittman*, 724 P.2d at 1383.

As Price does not allege the IBM job offer was for guaranteed employment, the only applicable factor to the issue of detrimental reliance in terms of Stephen's statements regards the acceptance of a decrease in salary. Price claims that the salary offer from IBM was 25% more than that of PSC, and that she accepted the PSC offer in reliance upon a guarantee that she would not be laid off. The language in *Schur* did not, however, contemplate the facts of the instant case. The example used in *Schur* of a reduction in pay constituting sufficient special consideration for permanent employment was taken from *Beeler*, 487 P.2d at 573, where, not only was the employment contract written, the reduction in pay was negotiated from a prior contract between the same employer and employee. The reduction in pay claimed by Price was not one negotiated with PSC from a prior level, but is a comparison of salaries offered by two separate employers.[13]

Price argues the mere fact that she gave up another job is sufficient reliance on the alleged representations of Stephens. (Pl.'s Resp.Mot.Part.Summ.J. at 10.) Generally, "the detriment sustained by the employee in preparing himself to accept the offered employment not mutually understood as being

part of the consideration, such as giving up a business or position, or relocation is insufficient to show that the parties intended more than a general indefinite hiring or hiring at will." 30 *C.J.S. Employer–Employee* § 27 at 55 (footnotes omitted). Such consideration is usually in the form of a "detriment" to the employee, strongly paralleling the detrimental reliance requirement in a promissory estoppel claim. *Id.*

■ Colorado decisions concerning special consideration for employment contracts reflect this position. "Relinquishing other employment [is generally] not alone considered special consideration. Giving up another position is necessary before the employee is in a position to accept and perform the offered employment and is not a price or consideration paid to the new employer." *Pickell*, 902 P.2d at 397; *see also, Snoey v. Advanced Forming Technology, Inc.*, 844 F.Supp. 1394 (D.Colo.1994). Drawing on these parallels to the express contract situation, I conclude that declining the previously accepted employment offer by IBM was a necessary precondition to accepting employment with PSC and did not constitute any detriment to Price.

■ In addition, the statements by Price's father, confirming the historical reality of no layoffs at PSC, were not statements which could be considered a commitment by PSC. Although Price's father was a former Vice President with PSC, he was retired at the time he made these statements, and was therefore not in a position to bind PSC.

#### (ii) Gary Peterson

■ Gary Peterson was one of Price's direct supervisors at PSC. (Pl.'s Resp. Part.Mot.Summ.J., Ex. 2 at 471.) He directed Price to seek information from lower level employees when she received no information after requests of their supervisors. (*Id.* at 471–72.) Peterson commented that the supervisors were "retired in place," meaning that they were no longer performing their duties and just waiting until their formal

---

**13.** As best as can be surmised from the record, Price had not even started, nor did she ever start work for IBM before she worked for PSC.

retirement date to leave PSC. (*Id.* at 471–74.) The implication of this remark was that PSC would not lay off poorly performing employees and provided job security until retirement. (*Id.* at 471–73.) Price states this remark reinforced the statements by Stephens that PSC maintained employment until retirement. (*Id.* at 472.)

I find, however, that such statements were no more than colloquial observations about the state of personnel affairs within PSC and were not made with any promissory intent. The remark that certain employees were "retired in place" simply suggests that they were not performing their duties and that their supervisors were not expecting them to do so. Even if other employees were allowed to shirk their responsibilities, this was not a direct guarantee to Price of future employment through retirement.

### (iii) Pat McCarter

Pat McCarter was a division manager and later Vice President of Engineering and Planning in the department in which Price worked. (*Id.* at 486–90.) He, like Peterson, described several employees as "retired in place" and "out of the loop" and instructed Price to come directly to him for any information she needed. (*Id.* at 486–87.) As discussed in relation to Peterson, there was no requisite promissory intent on the part of PSC that McCarter's statements should have been taken as a modification of the at-will employment relationship.

### (iv) Alan Albrant

■ Alan Albrant succeeded Peterson as Price's supervisor. (*Id.* at 477.) He also referred to certain employees as being "retired in place." (*Id.* at 476.) After Price complained that, without a concurrent promotion, she had been given job responsibilities similar to those of men who had been promoted or were at a higher grade or pay level, Albrant stated: "A bird in the hand is worth two in the bush[;] ... the pay may be lower but [you] always ha[ve] a job.... You can go elsewhere and make more but do you really want to give up a good retirement package?" (*Id.* at 479–80.) Price claims that "[t]hus the no-layoff policy was used by man-

agement to induce acquiescence with its judgments and compliance with its demands in spite of employee protests of unequal treatment."[14] (Pl.'s Resp.Part.Mot.Summ.J. at 7.)

As discussed above, the statements about employees being "retired in place" do not raise the possibility of promissory intent on the part of PSC. However, Price additionally posits that Albrant, as her supervisor, in direct response to her complaints about inequitable treatment in pay and promotion, garnered her forbearance of the complaints by promising that she would "always have a job" and a "good retirement package." This suggests a bargain-type situation. Albrant's purpose in making such statements could reasonably be viewed as PSC providing consideration to entice Price to drop her complaints before she pursued them further. As noted in *Schur*, the release of claims against an employer has been held to be sufficient "special consideration" to support an employer's promise of permanent employment. 878 P.2d at 54. There is therefore a disputed issue of material fact as to whether promissory intent could be ascribed to these statements.

### (v) Bruce Farrington

■ In 1980 Price filed a formal charge of discrimination with the Equal Employment Opportunity Commission (EEOC) which she summarily withdrew after a conversation with Bruce Farrington. (Pl.'s Resp.Part.Mot.Summ.J., Ex. 2 at 474–75.) Farrington, alternately described as a manager of labor relations and as a Vice President of PSC, (*see id.;* Pl.'s Resp. Part.Mot.Summ.J. at 8.), told Price: "[If you don't] drop the lawsuit ... [you will] be fired. If [you are] not fired ... Public Service Company Management [will] make [your] life so miserable that [you will] want to quit[.] ... [Are you] really willing to give up a guaranteed retirement to carry that lawsuit forward?" (Pl.'s Resp.Part.Mot.Summ.J., Ex. 2 at 421–23.)

A jury could reasonably find that Farrington's statements constituted promissory intent on the part of PSC. Price went so far as

14. This is the full extent of Price's argument on this point.

to file a complaint with the EEOC charging discriminatory practices by PSC in the workplace. Beyond the unveiled threats of retaliation, the implication of a secure job through "guaranteed retirement" could reasonably be interpreted in this context as an attempt to secure Price's relinquishment of her claims. As a matter of law it cannot be said that these statements merely constituted "vague assurances."

### (vi) Ken Fuller

Ken Fuller was a Vice President at PSC. Price met with him in 1984 to protest harassment and threats of termination by Carter Class, the manager of Albrant, her immediate supervisor. (Pl.'s Resp. Part.Mot.Summ.J., Ex. 2 at 477–78.) Price alleges her harassment by Class arose after she complained to him about her harassment by other employees. (*Id.* at 478.) Fuller assured Price that, "there is no way you will ever be fired. You have a job at Public Service as long as you want a job at Public Service. You're an excellent employee, and I will talk to Carter Class." (*Id.*)

In the context of the record, Fuller's statements assuring Price that she would not be fired, could not reasonably be interpreted as constituting a promise of permanent employment intended to be received as such. Price acknowledges she was "hysterical" and that Fuller was attempting to calm her down. (*Id.*)

### (vii) Bill Martin

Bill Martin was Vice President of the Electric Engineering division at PSC. Price alleges he made the following statements in requesting her to furnish data for an appeal to the Public Utilities Commission for approval of a rate increase: "[PSC i]s a monopoly.... PSC weather[s] the storm. [PSC] celebrates the good times and we make it through the bad times, and during the down times [PSC] goes in for rate increases.... Being a monopoly there are no layoffs." (Pl.'s Resp.Part.Mot.Summ.J., Ex. 2 at 444.) During a series of budget meetings during 1990, presumably a "bad time," Martin said: "As you know, we're doing more with less. There have never been any layoffs. There are not going to be layoffs." (*Id.* at 492, 499.) Additionally, during a safe-

ty meeting about two weeks before Price's termination, Martin spoke about the release, apparently posted on a bulletin board, in which PSC warned that there might be layoffs. (*Id.* at 441–443.) According to Price, Martin, denied that there would be any such layoffs. (*Id.* at 442.)

Martin's discussion of the monopoly status of PSC and the relationship of that status to internal layoffs could reasonably be viewed only as a general comment about corporate policy rather than as a commitment. Similarly, that part of Martin's 1990 statement concerning the issue of layoffs could not reasonably be considered as more than a recitation of historical fact. However, the prospective portion of this statement as well as the statement of denial just before Price's termination warrant closer scrutiny.

> Once an employer announces a specific policy or practice, especially in light of the fact that he expects employees to abide by the same, the employer may not treat its promises as illusory.... [I]f an employer, for whatever reason, creates an atmosphere of job security and fair treatment with promises of specific treatment in specific situations and an employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship. We believe that by his or her unilateral objective manifestation of intent, the employer creates an expectation, and thus an obligation of treatment in accord with those ... promises.

*Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219, 685 P.2d 1081, 1088 (1984) (concerning written promises made in an employee manual). Such *ratio* supports a finding that Martin's alleged pronouncements about layoffs could reasonably be considered specific statements about "specific treatment" in a "specific situation," *i.e.*, that in 1990 during a period of budget concerns, and again in 1991 two weeks before actual layoffs occurred, as a vice president of PSC, he assured employees there would be no layoffs. Taken in context, it cannot be said as a matter of law that such statements were vague and without

a reasonable expectation of promissory intent.[15]

### (viii) Phil Criste

Phil Criste was one of Price's supervisors who conducted her annual review in each year of her employment at PSC. (Pl.'s Resp.Part.Mot.Summ.J., Ex. 2 at 480–81.) Price states she complained to him each year during her evaluation that, despite "exceptional" performance reviews, she was never given the maximum allowable raise of 4% and instead only received 2% while others were given more. (*Id.* at 481–82, 85.) She alleges Criste repeatedly responded: "[H]ang around and collect your gold watch. Only so many number of years to go before you get that gold watch." (*Id.* at 480–81.) At Price's final review in July 1991, after again complaining about an inequitable raise, Criste replied: "[Y]ou ha[ve] only five years to go if [you] want[ ] to retire at age 55 and get that gold watch and that retirement package." (*Id.* at 484.) Price argues that "[g]uaranteed employment was a carrot used consistently to induce acceptance and cooperation." (Pl.'s Resp.Part.Mot.Summ.J. at 8.)

These statements by Criste are similar in nature and scope to those made by Albrant in response to Price's complaints about inequities in promotion. Standing alone, remarks about working a few more years to receive a "gold watch" and "retirement package" cannot reasonably be regarded as statements forecasting the employee's likely career progression. *See Soderlun,* 944 P.2d at 620–21 (*citing Snyder v. Ag Trucking, Inc.,* 57 F.3d 484, 489 (6th Cir.1995) (statement that employer was a "fair company" and that employee would have job until he retired if he performed well are not promises; they are "general comments about career growth and company policy"); *Ruud v. Great Plains Supply, Inc.,* 526 N.W.2d 369 (Minn.1995) (statement that "good employees are taken care of" mere statement of policy, not a promise); *Vancheri v. GNLV Corp.,* 105 Nev. 417, 777 P.2d 366, 369 (1989) ("General expressions of long-term employment or job advancement do not convert an at-will employment contract to a termination for cause only contract.")) However, given the context in which Criste's statements were made, there remains a question of fact as to whether they embodied a reliable promise of permanent employment to Price.

### (ix) Statements by PSC unattributable to any particular person.

Price asserts the following general comments were made on various occasions by employees of PSC. "It was a common joke to go around the table. How long you got left Fred; how long you got left, so and so." (Pl.'s Resp.Part.Mot.Summ.J., Ex. 2 at 498.) Employees were referred to as "out of the loop but permitted to continue working." (*Id.*) She does not attribute any of these statements to a person of supervisory stature at PSC, nor is any promissory in nature. At most such statements amount to an indication of the culture at PSC. They do not meet the threshold requirement of being statements that PSC would believe its employees would take as a commitment from their employer.

---

**15.** On November 7, 1991, the day that Price was laid off, Martin spoke to the remaining employees in his division. (*Id.* at 447.) He is quoted as stating: "[W]hen I hired on to this Company ... I figured if I didn't get into trouble and if I did a reasonably good job and had a bright idea once in a while, I'd probably have a job for life. That was my expectation when I came to Public Service." (Pl.'s Resp.Part.Mot.Summ.J., Ex. 3 at 14.)

The way our historic culture has been at Public Service Company, to eliminate jobs and terminate the employment of people who held them is a very traumatic event for them, for you and for those of us who had to do it. By the looks on some of your faces, I can guess that some of you are very angry, 'it was a dirty trick[;] why did you pull that on those people?'
(*Id.* at 1.)

As noted, this address was made after Price's layoff occurred and she was not in attendance. These statements are not ones upon which PSC would expect to instill a promissory intent toward employees generally. As Price was not present and in fact was no longer an employee, these cannot be construed as commitments toward her, much less statements upon which she could have relied to her detriment. *Orback v. Hewlett–Packard Co.,* 97 F.3d 429, 433 (10th Cir. 1996) ("[T]he promise relied on must be made to the employee who relies on it.")

## 2. Was there reliance on these statements by Price by any action or forbearance which was reasonable and to her detriment?

■ As discussed above, several of the alleged statements of Bill Martin could reasonably be construed to be statements of promissory intent and commitment. However, Price has not alleged any showing of specific reliance on either the 1990 or 1991 assurances that no reductions in force would occur. Price merely alleges that promises of no layoffs were made by Martin. No additional allegations of any changes in position as a result of these statements are in the record. At her deposition, Price was asked with reference to Martin's 1991 statements, after PSC had disseminated a release regarding the possibility of layoffs:

Q: Was it a topic of some concern, the release?

A: Not that I recall.

Q: So you don't remember talking with anyone about the release?

A: No.

These responses indicate Price was not concerned about the implications of the release itself. The release forecasting the possibility of job reductions did not prompt her to act in reliance by, for example, seeking other employment, foregoing incurring additional debt for fear of losing her income, or making inquiry about the future integrity of her particular department or position. As she did not change her position in reliance upon the release, she could not later claim any actions in reliance upon Martin's assurances, e.g., discontinuing a job search or incurring additional debt. Therefore a promissory estoppel claim based on these particular allegations must fail as a matter of law.

■ Further, as discussed earlier in the treatment of the alleged statements of Clark Stephens, traditional contract law provides the governing framework for interpreting employment relationships. *Soderlun*, 944 P.2d at 619. The development of the concept of "special consideration" in Colorado law as necessary for the transformation of an at-will employment arrangement into a permanent relationship, provides insight into the sufficiency of the reliance in a promissory estoppel claim. As noted in *Schur*, 878 P.2d at 54, provision of special consideration can involve a "release of claims" against an employer.

■ Reviewing the context of the alleged promises of employment until retirement made by Alan Albrant, Bruce Farrington, and Phil Criste, all were assertedly made with the purpose of inducing Price to withdraw her various complaints of sexual harassment, discrimination, inequitable pay, and failure to promote. I have been unable to find any cases, in Colorado or elsewhere, which address whether a release of claims under Title VII, or similar state law claims, operates as sufficient consideration for a contract claim of permanent employment, much less a claim based upon promissory estoppel.[16]

However, an analogous line of cases involving job related injuries, both pre and post advent of worker compensation statutes, is instructive. "A release by an injured employee of his claim against his employer for personal injuries previously sustained, a dismissal of such a claim, **or the forgoing by the employee of his right to prosecute that claim,** constitutes sufficient consideration to support a contract for permanent employment. . . ." 60 A.L.R.3d 226 § 6(a) (emphasis added). Such holdings have been consistent for over one hundred years. *See, e.g., Jessup v. Chicago & N.W.R. Co.*, 82 Iowa 243, 48 N.W. 77 (1891).

The facts alleged show a consistent pattern of complaints made by Price, promises made by Albrant, Farrington, and Criste, and reliance by Price through forbearance of any further action on these complaints. There is a genuine issue of material fact whether these complaints had sufficient merit to have given rise to a right to prosecute resultant claims.[17] If indeed, Price did have such a

---

16. To my knowledge, this issue has not been considered in a reported case.

17. The sexual harassment claims are now moot because Price is no longer employed by PSC.

Neither Judge Sparr in his initial analysis of the motion for summary judgment on the equal pay and failure to promote claims, nor Chief Judge Matsch in his *de novo* review (which accepted

right, her forbearance would constitute-sufficient reliance to uphold a claim in promissory estoppel, just as such forbearance is considered sufficient consideration in employment injury cases.

In addition to the comparable employment injury claim cases, the alleged PSC culture surrounding Price lends weight to the reasonableness of her claims. Other courts have held that "[i]n the employment context, factors apart from consideration and express terms may be used to ascertain the existence and content of an employment agreement, including the personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assurances of continued employment, and the practices of the industry in which the employee is engaged." *Pugh v. See's Candies*, 116 Cal.App.3d 311, 327, 171 Cal.Rptr. 917 (1981) (internal quotations and citation omitted); *see* J. Peter Shapiro & James F. Tune, Note, *Implied Contract Rights to Job Security*, 26 Stan.L.Rev. 335, 350–366 (1974).

Many of the facts set forth above, although not in themselves conclusive of promissory intent, lend support to developing the context of the employment relationship and the reasonableness of the reliance shown by Price. The corporate culture, if not unwritten policy, of PSC was to eschew layoffs. In the memory of every employee to whom a statement is attributed in the record, there is no evidence of historical layoffs at PSC. Martin's remarks after the layoffs which terminated Price's employment also support her reasonable reliance. His remarks about expecting to have a "job for life" and how the "historic culture" of PSC made the terminations "traumatic" are indicative of the significance of that culture.

Over the fourteen years that Price was employed by PSC, in addition to commitments specifically made to her, general actions and communications by her PSC supervisors can reasonably be considered as having reinforced the lifetime employment atmosphere. From the assurances made at her initial employment interview to references to non-performing long-term employees as "out of the loop" and "retired in place," all indications from management supported the policy of long-term job security.

Finally, the practice of the industry of public utilities supports Price's reasonable belief in the specific promises made to her. As Price alleges, whenever PSC fell upon a budgetary shortfall or suffered the effects of an economic downturn, the company historically applied to the Public Utilities Commission for a rate increase. Although cost centers and budgets were trimmed to save money, rate increases were sought rather than a cut into the workforce.

■ Because I find a factual question exists as to reasonable reliance on Price's part, I consider the issue of detriment. The possible detriment arising out of Price's reliance through forbearance is twofold. She has lost any relief she could obtain for Title VII claims; her sexual harassment claim is moot because she is no longer employed by PSC; and she could not include in this lawsuit the EEOC complaint which she filed and withdrew in 1980 due to Farrington's representations, as the statute of limitations under Title VII has long since expired. Additionally, her claims of unequal pay and failure to promote were both dismissed without reaching the merits of the alleged promises in question. Price's reliance through forbearance can therefore be construed as a deprivation of the relief which might otherwise have been available, assuming, of course, that any of these claims had arguable merit.

Judge Sparr's analysis), reached the merits. (Order *De Novo* Consider. Def.'s Mot.Summ.J., Aug. 1, 1995.) Judge Sparr dispensed with these claims because they were time barred, and the events which Price did allege in an attempt to create a relation-back under the continuing course of conduct doctrine were found not to amount to a violation of Title VII. (Mem.Op. & Order, Apr. 26, 1994); 42 U.S.C. § 2000e–5(e) (300 day filing period with EEOC after alleged discrimination occurs in order to bring suit); *Allen v. Denver Public School Board*, 928 F.2d 978 (10th Cir.1991). The discrimination claim in the present suit was based upon the circumstances of Price's termination, a different fact situation from that upon which the 1980 EEOC claim was based. Price does not raise the 1980 claim in this case, presumably because it too was time barred.

Second, Price has apparently lost a significant portion of her retirement pension, which would have been owed her if she had remained employed the requisite number of years. (Pl.'s Am.Compl. Apr. 16, 1997 ¶ 43.) She was repeatedly promised the benefit of the pension by Phil Criste when she complained to him of the inequity in her pay. Due to her early termination, Price is presumably unable to realize the full extent of this benefit. The loss of this benefit can be construed as a detriment.

### 3. Is there any injustice to Price as a result of any promises by PSC and her reliance thereon?

■ Relevant factors in determining whether injustice or unconscionable injury has occurred include "the nature of the representation of the employer, promises of future financial rewards, the nature of the employee's action in reliance, and the relinquishment of prior/other employment." *Chidester*, 859 P.2d at 225. As already discussed, here the relinquishment of other employment is inapplicable.

■ Any promise of future financial rewards amounted to one of secure retirement benefits. From the facts in the record, the inference is that Price is either no longer entitled to a pension or that the pension she would have received is significantly diminished. Dependent upon the actual nature of the PSC retirement program and the nature of the severance package which Price may have received upon her termination, these benefits could have been significant.

I find some of PSC's representations can be construed reasonably as promises of employment until retirement made in exchange for forbearance by Price in filing any potential equal employment claims she may have had. Price was not able to bring these claims in this or any future action due to the expiration provisions under Title VII. Had she not relied upon her supervisors' assurances of guaranteed employment and retirement benefits, Price could have pursued her claims of sexual harassment, discrimination, and inequitable pay and promotion before the time bars now precluding these claims under Title VII.

■ The potential injustice of this forbearance can be compared to situations invoking equitable estoppel. Although the statute of limitations may have run, a court may exercise its equitable power to allow a suit to continue if it finds a claimant was induced to action or forbearance of a material character, and in reasonable reliance on the inducement, the claimant failed to bring suit within the applicable time period. *Ralston Oil and Gas Co. v. July Corp.*, 719 P.2d 334, 340 (Colo.App.1985); *Strader v. Beneficial Finance Co.*, 191 Colo. 206, 551 P.2d 720, 724 (1976). In this case, there is no request for a tolling of any statute. The fact that reliance on an inducement to forego prosecuting an arguable claim may constitute cause for a court to waive the statute of limitations on grounds of equity, however, indicates that, in the context of a promissory estoppel claim, the resultant injustice of such reliance may be considered significant.

### CONCLUSION

For the reasons stated above, *Stull v. Combustion Engineering, Inc.*, 72 Ohio App.3d 553, 595 N.E.2d 504 (1991), is instructive. There, the court considered the promissory estoppel claim of an employee who had been laid off. It noted that neither statements in employee manuals nor pension plan policies provided a promise upon which to rely reasonably. *Id.* at 507.

However, a different situation is presented by [Plaintiff's] claim that his immediate supervisor, on two separate occasions, remarked that [Plaintiff] would be around until the plant closed. Thus, we find that the supervisor's remarks, made **in the context** of discussing [Plaintiff's] future with the company in the event of a reduction in force, when considered in light of [Plaintiff's] thirty-four year tenure with the company and [the employer's] policy regarding seniority rights, could reasonably be construed as a promise for continued employment until [Plaintiff] retired, or at the very least, until the company was forced to finally close its doors as a going concern. We are unable to say that rea-

sonable minds could not differ as to this point.

Moreover, inasmuch as there is some evidence in the record as to [Plaintiff's] reliance upon these representations, the applicability of the doctrine of promissory estoppel is an issue which should have been resolved by the trier of fact.

*Id.* (emphasis added).

Similarly, in this case, from 1980 when she filed her EEOC complaint through July 1991, four months before she was terminated, Price was promised secure employment until her retirement in the context of her formal complaints about sexual harassment and disparate treatment. In reliance upon these promises, Price continued to forego her claims upon the belief that she would have a secure and adequate pension upon retirement. When considered in light of the repeated promises to induce her acquiescence and the general corporate culture which historically avoided layoffs or dismissals except for egregious cause (*e.g.*, embezzlement), the promises made by Price's supervisors could reasonably be construed as a promise for employment until Price retired. Reasonable minds could certainly differ in this regard and the issues should be resolved by the trier of fact.

Accordingly, Price's sexual harassment claim is dismissed due to her lack of standing. Genuine issues as to material facts preclude summary judgment on the promissory estoppel claim. The motion for partial summary judgment is granted in part and denied in part.