Edward D. RUSSELL, et al., Plaintiffs,

v.

GTE GOVERNMENT SYSTEMS CORPORATION, et al., Defendants.

No. C–3–99–499.

United States District Court, S.D. Ohio, Western Division.

Oct. 23, 2002.

Elaine S. Bernstein, Dayton, OH, Donald M. Desseyn, Mechanicsburg, PA, for plaintiff.

Robert Jennings Townsend, Roger Alan Weber, Taft Stettinius & Hollister–1, Cincinnati, OH, for defendant.

DECISION AND ENTRY OVERRULING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOC. # 55); DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. # 60) SUSTAINED IN PART AND OVERRULED IN PART; CONFERENCE CALL SET

RICE, Chief Judge.

This litigation arises out of Plaintiff Edward Russell's employment with Defendant GTE Government Systems Corporation ("GTE Government") to work on a project known as the ATLAS Project in Feltwell, England, beginning on August 21, 1993.[1] Plaintiff's original Complaint named three Defendants: GTE Corporation ("GTE"), GTE Government, and Karen Ulen ("Ulen"), Deputy Program Manager for the ATLAS program. As a result of the filing of Plaintiff's Second Amended Complaint (Doc. # 32) on July 13, 2000, GTE Government is the sole remaining Defendant.

In his Second Amended Complaint, alleging subject matter jurisdiction by way of diversity of citizenship, Plaintiff has set forth six claims for relief, which can be divided into two groups. *First,* Russell has set forth four state law claims for breach of contract, based on Defendant's (1) failure to compensate him for his standby time (presumably between November of 1993 and May of 1996) (Count One); (2) failure to compensate him for his standby time between June of 1996[2] and September of 1998 (Count Two); (3) reduction of his field premium (Count Three); and (4) reduction of his housing allowance (Count Four). *Second,* Plaintiff has asserted two state law promissory estoppel claims, based on Defendant's failure to pay full joint travel regulation ("JTR") lodging and meals and incidental expenses ("M & IE") for Plaintiff, and one-half (50%) of his dependents' JTR and M & IE (Count Five), and its failure to abide by promises in the Field Assignment document[3] (Count Six).

Pending before the Court are Motions for Summary Judgment, submitted by both Plaintiff (Doc. # 55) and Defendant (Doc. # 60). Plaintiff has moved for summary judgment on each of his claims. Defendant has argued that it, rather than Plaintiff, is entitled to summary judgment on Counts One, Two, Five, and Six, because Plaintiff cannot establish all of the elements of those claims. In addition, Defendant has sought summary judgment in its favor on all of Plaintiff's claims, due to various affirmative defenses. For the reasons assigned, Plaintiff's Motion is OVERRULED in its entirety, and Defendant's

---

1. Originally, Russell's wife, Lizette Russell, brought a claim for relief in this action. Mrs. Russell was dismissed as a party-plaintiff with the filing of the First Amended Complaint (Doc. # 12).

2. In his Second Amended Complaint, Plaintiff indicates that in June, 1996, he was placed on a three man rotation for standby, and that he began receiving pay for his turn on the rotation only, "even though he was required to be available and on standby for the remaining two-thirds of the time but was not the person scheduled on call." (Doc. # 32, ¶ 13)

3. Plaintiff asserts that the Field Assignment document, which he signed on April 8, 1994, constitutes a contract between the parties. Defendant contests that assertion.

Motion is SUSTAINED in PART and OVERRULED in PART.

## I. *Factual Background* [4]

Plaintiff Edward Russell is a Systems Engineer with twenty-one (21) years of experience in the operation and maintenance of satellite communications equipment. In 1985, he was hired by Defendant GTE Government and, as part of his employment, he has worked at several overseas locations. From 1985 to 1990, he was employed in Japan as the Technical Director of Engineering at LadyLove Field. From 1992 to 1993, he was the Field Site Manager for the Phoenix Project in San Vito, Italy. From 1993 to 1998, he was the Systems Engineering Manager at the Royal Air Force Base in Feltwell, England.

Each time Plaintiff was deployed to an overseas site, he was given a Field Assignment document, which set forth the terms and compensation of his foreign assignment. These documents outlined, *inter alia*, the compensation for travel, field premium, housing allowance, personal effects moving allowance, tuition, authorized dependent visits, income tax, overtime, home leave, expense reports, time cards, a no fault clause, and the official termination date. Plaintiff alleges that these documents constituted employment contracts.

Prior to August 20, 1993, while Plaintiff was located in San Vito, Italy, he discussed with GTE Government employees the terms of his next field assignment, working on the Atlas Project in Feltwell, England. On April 8, 1994, Plaintiff signed a Field Assignment document, with an effective date of August 21, 1993 (estimated), to September 30, 1994 (estimated) (Pl.'s Depo. Vol. I, Ex. 8). According to that document, Plaintiff was to receive a field premium of 15%, and a daily housing allowance of $37.84. In addition, the Field Assignment document provided that "[r]equired standby time worked will be paid at the rate of 25% of the actual hours on standby ... If 'Call In' from stand-by or off duty hours, the employee will be paid a minimum of one hour for responding per 'Call In.' Any time charged to the 'Call In' beyond the one hour must be the actual hours worked...." Plaintiff indicates that this Field Assignment document reduced to writing the terms that had been discussed during the previous Summer. Plaintiff did not receive or sign any subsequent Field Assignment documents during his tenure in Feltwell.

In November of 1993, the Site Manager at Feltwell, Lee Grubb ("Grubb"), issued a beeper to Plaintiff. Plaintiff was instructed that he was to carry the beeper when he was not required to be physically at work. Grubb informed Plaintiff that he had to be available to respond to his beeper, even when he was not officially on the standby schedule. In January of 1995, Plaintiff was notified that his field premium would be reduced from 15% to 10%. On October 1, 1995, his housing allowance was likewise reduced, resulting in a decrease of approximately $12.00 per day.

In July of 1998, Plaintiff began to make plans to leave the Atlas Project, as the contract between GTE Government and the United States was due to expire on October 1, 1998. Plaintiff began to seek new employment, to begin on August 1, 1998. Plaintiff states that the Site Manager, Mr. Michael Vanover ("Vanover"), in-

---

4. The following facts are derived from the evidence submitted by the parties in support of their Motions for Summary Judgment (Doc. # 55, 60). In setting forth the factual background, the Court has attempted to include only the uncontroverted facts. In its substantive analysis, *infra*, the Court will recite additional pertinent facts, construing those facts and all reasonable inferences most strongly in favor of either Plaintiff or Defendant, as the analysis warrants.

duced him to stay on site until the completion of the contract by promising him that he would receive full joint travel regulation ("JTR") lodging and meals and incidental expenses ("M & IE") for himself, as well as one half JTR and full M & IE for his four dependents. On August 24, 1998, Plaintiff was notified that he would be paid full JTR and M & IE for himself, but that he would receive only 50% M & IE and no compensation for JTR lodging for his dependents. On October 1, 1998, Plaintiff left both Feltwell, England, and GTE Government's employment.

## II. *Standard Governing Motions for Summary Judgment*

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *see also Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991)(The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial.")(quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial."

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law, Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Michigan Protection and Advocacy Serv., Inc. v. Babin,* 18 F.3d 337, 341 (6th Cir. 1994)("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson,* 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in favor of that party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the factfinder. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure,* § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.,* 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915 n. 7 (5th Cir.), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992)("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment....") Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

III. *Motions for Summary Judgment (Doc. # 55, # 60)*

A. *Choice of Law*

 As an initial matter, the parties dispute whether the instant action is governed by Colorado law or English law.[5] "To resolve this dispute, a federal court whose jurisdiction is based on diversity of citizenship must apply the conflict of law rules of the forum state." *Johnson v. Ventra Group, Inc.,* 191 F.3d 732, 738 (6th Cir.1999). Thus, when a diversity case is commenced in Ohio, as has occurred herein, Ohio choice of law rules are applied. *See Klaxon Co. v. Stentor Electric Mfg.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Ohio has adopted the approach of the Restatement (Second) of Conflict of Laws. *Saglioccolo v. Eagle Ins. Co.,* 112 F.3d 226, 230 n. 3 (6th Cir.1997); *Lewis v. Steinreich,* 73 Ohio St.3d 299, 652 N.E.2d 981, 984–85 (1995); *Schulke Radio Prod. v. Midwestern Broadcasting,* 6 Ohio St.3d 436, 453 N.E.2d 683 (1983). Under that approach, when the parties have failed to specify which state's substantive law should govern the contract (as in the present circumstances), the court should determine which state has "the most significant relationship to the transaction and the parties." *Carr v. Isaacs,* 2002 WL 553715, *3 (Ohio App. 12 Dist. Apr.15, 2002); *Schulke Radio Prod.,* 453 N.E.2d at 686, quoting Restatement of Law 2d, Conflict of Laws § 187 (1971); *Ohayon v. Safeco Ins. Co. of Ill.,* 91 Ohio St.3d 474, 477, 747 N.E.2d 206

---

**5.** In his Motion for Summary Judgment (Doc. # 55), Plaintiff originally applied Ohio law to his claims. Since Defendant raised the choice of law issue, Plaintiff has argued that Colorado law is the proper law to apply.

(Ohio 2001). To assist in this determination, the court should consider: (1) the place of contracting, (2) the place of negotiation, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties. Restatement of Law 2d, Conflict of Laws § 188; *see Gries Sports Enterprises, Inc. v. Modell,* 15 Ohio St.3d 284, 473 N.E.2d 807 (Ohio 1984). The principles underlying these factors are set forth in section 6 of the Restatement. Those principles are: (1) the needs of the interstate and international systems, (2) the relevant policies of the forum, (3) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (4) the protection of justified expectations, (5) the basic policies underlying the particular field of law, (6) certainty, predictability and uniformity of result, and (7) ease in the determination and application of the law to be applied. *Id.* at § 6; *Medical Mutual of Ohio v. deSoto,* 245 F.3d 561, 570 (6th Cir.2001) (applying § 188 and § 6). The Sixth Circuit has stated that these principles provide merely a general framework for resolving the choice of law issue:

> "Turning to the application of the factors set forth in section 6 of the Restatement, we note that, even when sections 6 and 188 are read together, it is clear they only provide a broad general framework for the resolution of choice of law issues . . . ." *International Ins. Co. v. Stonewall Ins. Co.,* 86 F.3d 601, 606 (6th Cir.1996) [ (applying Ohio law) ]. Indeed, "[w]ithin that framework, a judge must balance principles, policies, factors, weights, and emphases to reach a result, the derivation of which, in all honesty, does not proceed with mathematical precision." *Id.*

*deSoto,* 245 F.3d at 571. With these principles in mind, the Court turns to the choice of law issue in the present litigation.

1. *Place of Contracting*

Defendant asserts that England is the most significant forum to this dispute, because Plaintiff signed the alleged contract on April 8, 1994, while he was in England. Plaintiff responds that the formal offer for him to come to England was extended to him while he was in Italy by Mr. Milt Sprague, who was located in Colorado. Although the undisputed evidence indicates that Plaintiff signed the Field Assignment document on April 8, 1994, while he was working at the Feltwell site in Feltwell, England (Russell Depo. Vol. II, Ex. 8), Plaintiff has also testified that the written agreement merely reduced to writing the terms he had discussed with Ms. Joyce Yaksick and Mr. Sprague and to which he had agreed prior to traveling to England. (Russell 2001 Depo. at 23–28; Russell Aff. ¶ 4). In light of the competing alleged sites of the creation of the contract, the Court concludes that this factor does not strongly favor either Colorado or England.

2. *Place of Negotiation*

Defendant asserts that there was no negotiation of the alleged contract and, therefore, this factor is inapposite. Plaintiff contests this assertion, arguing that the employment agreement for the position of Engineer for the Atlas Project in Feltwell was negotiated by Ms. Yaksick, Mr. Sprague, and himself. In particular, Russell testified in his deposition that he had a conversation with Ms. Yaksick prior to his departure from his assignment in Italy. (Russell 2001 Dep. at 23). Russell indicated that he may have had more than one conversation with Ms. Yaksick about the terms and conditions of the Feltwell field assignment (*id.* at 31), and that he

also talked about the general compensation for the assignment with Mr. Sprague (*id.* at 32). In his affidavit accompanying his Opposition Memorandum (Doc. # 63), Plaintiff stated that the terms of his employment in Feltwell were negotiated between himself and Mr. Sprague via telephone over the course of three or four conversations (Russell Aff. ¶ 2). He further stated that he spoke with Ms. Yaksick, who was located in California, on at least three occasions regarding the benefits associated with the position in Feltwell (Russell Aff. ¶ 3). Plaintiff testified in his deposition that the terms and conditions of his assignment in Feltwell, England, were consistent with the terms presented in the Field Assignment document, which he was given in 1994. (*Id.* at 23–28). In response, GTE Government notes that Plaintiff testified in his deposition that he had had only one telephone conversation with Mr. Sprague about the terms of the Feltwell assignment, and that Russell could not recall the details. Thus, Defendant proffers that no negotiations occurred, and that this factor is irrelevant.

Although there is conflicting evidence regarding the extent of the negotiations of Plaintiff's employment in England, the Court disagrees that this factor is irrelevant. It appears uncontested that, prior to arriving in England, Plaintiff had one or more conversations with GTE Government representatives regarding the terms of his employment in Feltwell. It is likewise undisputed that during these conversations, Plaintiff was located in Italy, Mr. Sprague was in Colorado, and Ms. Yaksick was in California. Thus, to the extent that any negotiations occurred, they did not occur in England. Thus, while this factor does not weigh strongly in favor of a particular jurisdiction within the United States, it does not weigh in favor of England at all.

### 3. *Place of Performance and Location of the Subject Matter of the Contract*

GTE Government argues that the promises and contract at issue concern Plaintiff's employment in Feltwell, England, and that England is the location in which the alleged breaches of the contract took place. In its Reply Memorandum (Doc. # 65), Defendant further notes that Plaintiff performed his job duties in England, and his work was directed by GTE Government site managers in that locale. Thus, Defendant argues, the place of the performance of the contract and the location of the subject matter of the contract are clearly in England.

Plaintiff responds that Colorado Springs, Colorado, was considered his "home base," for employment purposes, while he was stationed in Feltwell (*Id.* at 8). He indicates that all payroll records and time cards were submitted to Colorado on a weekly basis, and that any issues regarding compensation, benefits, tuition reimbursement, and the like were communicated to Ms. Yaksick in California (*Id.* at 6–7). He further notes that the equipment upon which he worked while in England was owned by the United States Air Force and/or the United States government (*id.* ¶ 13), and that during his assignment in England, he traveled three or four times on temporary duty to Colorado Springs, and twice to Japan in support of GTE Government's contract with the United States government (*Id.* ¶ 11–12). In addition, it appears that the decisions to decrease the field premium and the housing allowance, and the decision not to pay for standby backup time were made by GTE Government personnel in the United States.

Upon review of these facts, it is clear that the place of performance of the contract for Plaintiff was England, and the subject matter of the agreement, *i.e.*, his

job at the Feltwell site, was likewise in England. However, Plaintiff has provided evidence that Defendant administered its obligations under the contract, in part, in Colorado Springs, Colorado, and in California, and that general oversight of the Feltwell Project occurred from Colorado Springs. (*See* Vanover Depo. at 89) (program manager was located in Colorado Springs, Colorado). Accordingly, the Court concludes that, while this factor weighs in favor of England, it does not weigh as strongly as Defendant suggests.

### 4. *Domicile, Residence, Nationality, Place of Incorporation, and Place of Business of the Parties*

Defendant asserts that, at the time of the events giving rise to this litigation, Plaintiff was domiciled in and was a resident of England. GTE Government further argues that its place of business, in relation to the alleged contract at issue, was also Feltwell, England. Plaintiff counters that he is an American citizen, and that GTE Government is an American corporation. Although Plaintiff resided in England to fulfill his obligations regarding the Feltwell field assignment and GTE Government had operations at that site, the Court finds more significant the fact that Plaintiff was an American citizen, employed with an American company, whose headquarters (for purposes of the Feltwell project) were located in Colorado Springs, Colorado. This factor favors applying Colorado law.

Upon balancing the above factors, in light of the principles set forth in § 6 of the Restatement, the Court concludes that the most relevant law to this litigation is Colorado law. Although Plaintiff's performed his job duties on English soil, the Court agrees with Plaintiff that the instant dispute is between American nationals regarding the fulfillment of a contract with the United States government, and it has little connection with England or English law. As stated by Plaintiff, "[t]he only contact England has to this lawsuit is that an American citizen worked for an American company on American equipment on English soil. England has no interest in this case. The outcome has no effect on England or English law." (Doc. # 63 at 7). Moreover, while Plaintiff was located in England during the relevant time period, Defendant set forth the terms of the field assignment from its offices within the United States, and it communicated those terms to Plaintiff while he was on an international assignment in Italy. GTE Government's agents prepared the policies regarding field premiums, housing per diems, hotel reimbursement, and other benefits from its offices in California and Colorado Springs. Moreover, Plaintiff has provided evidence that payroll and other benefit issues were transmitted to GTE Government in Colorado Springs and then to California, and that Colorado Springs was considered to be his "home base." Thus, despite Plaintiff's overseas work location, it is doubtful that the parties expected their relationship to be governed by a foreign law, or that England would have a strong interest in resolving this employment dispute. In addition, considering the fact that Defendant handles government contracts all over the globe, conducting employment litigation in a forum in the United States would certainly foster predictability and facilitate the resolution of legal issues. *See* Restatement, Conflict of Laws § 6. Within the United States, the evidence indicates that Plaintiff's primary contact was with the Colorado Springs offices, rather than those in California. Accordingly, the Court concludes that, although Plaintiff worked in Feltwell, England, during the relevant time period and the alleged breaches affected him at that location, Colorado has the most significant relationship to the contract. The Court, therefore, concludes that it is most

appropriate to apply Colorado law to this dispute.

## B. *Breach of Contract Claims*

As stated, *supra,* in his Second Amended Complaint, Plaintiff has set forth four breach of contract claims, based on GTE Government's failure to compensate him for his standby time between November of 1993 and May of 1996 (Count One), its failure to compensate him for his standby time between June of 1996 and September of 1998 (Count Two), its reduction of Plaintiff's field premium (Count Three), and its reduction of his housing allowance (Count Four). Plaintiff's claims are premised on his contention that the Field Assignment document, dated August 20, 1993, and the document signed by Plaintiff on April 8, 1994, constitute contracts of employment.

■ It is well-established that, in order to recover for breach of contract in Colorado, a plaintiff must prove the following elements: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff. *Western Distributing Co. v. Diodosio,* 841 P.2d 1053, 1058 (Colo.1992) (citations omitted); *Arenberg v. Central United Life Ins. Co.,* 18 F.Supp.2d 1167, 1172 (D.Colo.1998).

### 1. *Existence of a Contract*

As an initial matter, GTE Government disputes that it entered into an employment contract with Plaintiff. *First,* Defendant argues that the alleged August 20, 1993, contract does not exist, as it was never signed by the parties. It states that the only Field Assignment document signed by Plaintiff was the document signed on April 8, 1994. *Second,* GTE Government asserts that Plaintiff had an at-will employment relationship with it, and that the Field Assignment document

did not create a contract. *Third,* Defendant asserts, assuming *arguendo* that the Field Assignment document does create a contract, that the contract expired after one year.

### a. *August 20, 1993, Field Assignment Document*

■ Addressing Defendant's first argument, there is no evidence that the parties ever signed the Field Assignment document in August of 1993. Accordingly, the Court agrees with Defendant that the parties did not enter into a written agreement at that time. However, Plaintiff has presented evidence that he entered into an oral contract with Defendant, beginning in August of 1993, and that the agreement was reduced to writing in April of 1994. Specifically, Plaintiff testified during his deposition that he had discussions with Ms. Yaksick and Mr. Sprague regarding the terms of his assignment in Feltwell during his tenure in Italy, and that the written agreement, dated April 8, 1994, reduced those discussions to writing. The Court therefore concludes that Plaintiff has presented evidence that the parties entered into an oral contract in August of 1993, which was consistent with the written contract, signed by Plaintiff on April 8, 1994. Accordingly, there is a genuine issue of material fact as to whether an oral contract was created, and Defendant is not entitled to summary judgment on that basis. To the extent that Plaintiff's claim is based on a written contract, created in August of 1993, Defendant's Motion for Summary Judgment is SUSTAINED.

### b. *April, 1994, Field Assignment Document*

■ Next, the Court is presented with the question of whether the terms of the April, 1994, Field Assignment document created an enforceable contract between

the parties. To form a contract in Colorado, the essential components include competent parties, subject matter, legal consideration, mutuality of agreement, and mutuality of obligation. *Vaske v. DuCharme, McMillen & Assoc., Inc.*, 757 F.Supp. 1158, 1161 (D.Colo.1990); *Peterson v. Trailways, Inc.*, 555 F.Supp. 827, 831 (D.Colo.1983) (quoting *Denver Truck Exchange v. Perryman*, 134 Colo. 586, 307 P.2d 805, 810 (1957)). In its Motion, Defendant argues that Plaintiff was an at-will employee, who could terminate his employment at any time. Ms. Patricia Molvar, GTE Government's Director of Human Resources and Security, testified in her deposition that Russell was an at-will employee, and that both he and GTE Government could terminate his employment at any time (Molvar Depo. at 9–10). Plaintiff has likewise testified that he could have resigned at any time (Russell Depo. Vol. II at 312).

■ The fact that Plaintiff's employment was terminable at-will does not require the conclusion that the parties could not have reached an agreement regarding Russell's compensation and other benefits. *See Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909 (Colo.1996). In fact, it is common that employment contracts fail to specify a definite term of employment. *See Memorial Gardens, Inc. v. Olympian Sales & Management Consultants, Inc.*, 690 P.2d 207, 210–11 (Colo.1984) (noting that the Restatement (Second) of Torts distinguishes between interference with contracts that are terminable at-will and those which are not). Thus, courts in Colorado, as well as in other jurisdictions, have recognized that, unless circumstances indicate otherwise, an employment contract "which sets forth an annual salary rate but states no definite term of employment is consid-

ered to be indefinite employment, terminable at the will of either party without incurring liability for breach of contract." *E.g., Id.* at 913–14; *Justice v. Stanley Aviation Corp.*, 35 Colo.App. 1, 530 P.2d 984, 985 (1974). In other words, while an at-will employment relationship may preclude a plaintiff from prevailing on a breach of contract claim based on wrongful termination, *see Allabashi v. Lincoln Nat'l Sales Corp. of Colorado-Wyoming*, 824 P.2d 1 (Colo.Ct.App.1991), a plaintiff may still have an enforceable employment contract with regard to the terms of compensation and other benefits. Thus, the fact that Plaintiff had an at-will employment relationship does not preclude his breach of contract claim, as a matter of law.

■ GTE Government also contends that the Field Assignment document does not create a contractual relationship, because Plaintiff did not give any consideration for the terms therein and because there was no meeting of the minds. Defendant argues that Russell did not give any consideration for the alleged employment contract, because he did not agree to work for a specified period of time. Plaintiff asserts that he gave consideration for the agreement, in the form of his commitment to perform the duties and responsibilities of his position. The Court agrees with Plaintiff. Although Russell did not give any "special consideration,"[6] such as is required to create a non-at-will employment relationship, *see Price v. Public Serv. Co. of Colo.*, 1 F.Supp.2d 1216, 1228 (D.Colo.1998), Plaintiff's performance of his job duties constitutes consideration for his compensation and benefits.

In addition, Defendant asserts that no contract was formed, because there was no meeting of the minds regarding the dura-

---

6. Special consideration may include accepting a decrease in salary, relinquishing other guaranteed employment, releasing claims against the employer, or providing the employer with expertise and customer contacts. *Price*, 1 F.Supp.2d at 1228.

tion of the alleged employment contract. Defendant argues that "[s]ince both Plaintiff and GTE [Government] did not know the length of Plaintiff's assignment or employment at Feltwell when Plaintiff accepted that assignment or signed the alleged contract, there is an issue of fact regarding a meeting of the minds on the duration of the alleged contract." (Doc. # 60 at 22).

"The general rule is that if contracting parties ascribe different meanings to a material contract term which is ambiguous, there has been no meeting of the minds and no valid contract exists." *Real Equity Diversification, Inc. v. Coville*, 744 P.2d 756 (Colo.Ct.App.1987); *Sunshine v. M.R. Mansfield Realty, Inc.*, 195 Colo. 95, 575 P.2d 847 (1978). "However, an exception to the general rule is observed when the meaning that either party gives to the document's language was the only reasonable meaning under the circumstances. In such cases, both parties are bound to the reasonable meaning of the contract's terms." *Sunshine*, 575 P.2d at 849, citing 1 A. Corbin, Contracts § 104 (1963) and 1 S. Williston, Contracts § 94 (W. Jaeger 3d ed.1957). In the present case, both parties acknowledge that Ms. Yaksick and Mr. Sprague communicated to Plaintiff, while he was in Italy, the terms of compensation and other benefits that Mr. Russell would receive at the Feltwell site. Plaintiff indicated that he agreed with those terms and that they were reduced to writing in the April 8, 1994, Field Assignment document. In light of the fact that Plaintiff was an at-will employee, that he had already begun working in England and that he continued to do so after signing the Field Assignment document, it is questionable to the Court whether the exact duration of the Field Assignment document is a material term in Plaintiff's employment arrangement with GTE Government. In light of the foregoing, the Court concludes that a reasonable jury could conclude that GTE Government and Russell entered into a valid contract regarding the compensation and benefits he would receive in exchange for his employment at the Feltwell, England site, either in the form of an oral contract in August of 1993 or a written contract in April of 1994. *See Beach v. Beach*, 56 P.3d 1125, 1127 (Colo.App. 2002)("The existence of an oral contract, its terms and conditions, and the intent of the parties are questions of fact to be determined by the trier of fact."); *Huddleston v. Union Rural Electric Ass'n*, 841 P.2d 282, 291–92 n. 12 (Colo.1992). Accordingly, the Court concludes that there is a genuine issue of material fact as to whether an express contract was created, both orally in August of 1993 and in writing in April of 1994, concerning same. Defendant's Motion for Summary Judgment on Plaintiff's breach of contract claim, on the ground that no express contract was created, is OVERRULED.

Assuming, *arguendo*, that no express written contract was created via the Field Assignment document, there is a genuine issue of material fact as to whether an implied contract was created, thus supporting a breach of contract claim. "An employer's statements and policies may form the basis of legal obligations to its employees. An employer may be liable under an implied contract theory where its policy conveys an offer that its employees accept and for which consideration is given." *Shaw v. Sargent Sch. Dist. No. RE–33–J*, 21 P.3d 446, 448 (Colo.Ct.App.2001), citing *Continental Air Lines, Inc. v. Keenan*, 731 P.2d 708 (Colo.1987) and Restatement (Second) of Contracts § 90 (1981); *Vasey v. Martin Marietta Corp.*, 29 F.3d 1460, 1464 (10th Cir.1994).

Under an implied contract theory, a discharged employee must first show that in promulgating an employment manual or policy, the employer was making an offer to the employee—"that is, the em-

ployer manifested his willingness to enter into a bargain in such a way as to justify the employee in understanding that his assent to the bargain was invited by the employer and that the employee's assent would conclude the bargain." Additionally, the employee must show that his initial or continued employment constituted acceptance of and consideration for those procedures.

*Vasey,* 29 F.3d at 1464 (citations omitted).

Herein, Defendant has argued that the Field Assignment document was "merely a statement of GTE [Government's] foreign long term policy which was applicable to Plaintiff for a 12 month period from the date he arrived at Feltwell on October 1, 1993 through September 30, 1994." (Doc. # 60 at 20). Ms. Molvar testified in her deposition that the document "outlines what the polices were for employees who were going out on field assignments with the company." (Molvar Depo. at 10). Both parties acknowledge that Ms. Yaksick and Mr. Sprague discussed the terms of the field assignment in Feltwell with Plaintiff prior to his arrival in England, and Plaintiff has indicated that those terms were acceptable. Consequently, Plaintiff relocated to England at the conclusion of his assignment in Italy. Construing the evidence in the light most favorable to Plaintiff, there is a genuine issue of material fact as to whether the discussions in August of 1993 and the 1994 Field Assignment document, which reduced those terms to writing, created an implied contract. Accordingly, Defendant's Motion for Summary Judgment on

Plaintiff's breach of contract claim, on the ground that no contract was created, is OVERRULED.[7]

#### c. *Duration of the Alleged Contract*

GTE Government asserts that, assuming a contract was created via the Field Assignment document, the express terms of the agreement indicate that it expired on September 30, 1994. Plaintiff testified that he believed that the terms of the agreement would last for the duration of his assignment in Feltwell, England. Although Plaintiff indicated that he had signed numerous Field Assignment documents when he was posted in other foreign locations, he stated that he believed that he was provided one Field Assignment document, and that "it was just updated each year with the same benefits and provisions that were agreed to when we went to the foreign location." (Russell Depo. Vol. III at 10–12). Plaintiff further cited to the deposition testimony of Michael Vanover, who stated that it was his expectation that GTE Government would be bound by the terms of the Field Assignment documents in exchange for his working at the Feltwell site. (Vanover Depo. at 38–39).

Defendant notes that the Field Assignment document, signed by Plaintiff, indicates that its term is from August 21, 1993 (estimated), until September 30, 1994 (estimated).[8] Mr. Vanover indicated that a new Field Assignment document was to be issued once the estimated termination date on the form had passed (Vanover Depo. at 51–52).[9] Plaintiff likewise stated that

---

7. As discussed, *infra,* the Court concludes that there are genuine issues of material fact regarding the duration of the Field Assignment document and the definition of the term "standby." Thus, for purposes of analyzing Plaintiff's Motion for Summary Judgment regarding his breach of contract claims, the Court will assume, *arguendo,* that the Field Assignment document constitutes a contract.

8. Plaintiff's Field Assignment document for his tenure in Italy states that it is effective September 7, 1992, until September 30, 1993 (Pl.'s Depo. Vol. I Ex. 3).

9. Specifically, Mr. Vanover testified:

Q: ... Were you ever advised by GTE or a representative of GTE that a new field agreement was to be issued once the esti-

Field Assignment agreements were "reinitiated" each year (Russell Depo. Vol. II at 337). Plaintiff indicated that he inquired whether he would receive another Field Assignment document upon reaching the expiration date of the one at issue, and that he was told that no more documents would be given.

Construing the evidence in the light most favorable to Defendant,[10] there is a genuine issue of material fact as to the duration of the contract. The only evidence in support of Plaintiff's assertion that the term of the written Field Assignment document was the duration of his assignment in Feltwell is his own subjective belief that the terms would continue beyond September 30, 1994. In contrast, Defendant has provided evidence that the language of the Field Assignment document indicates that it terminated on September 30, 1994, and that the terms of that document did not continue for the duration of Plaintiff's assignment to the Feltwell site. In addition, Defendant has provided evidence that prior Field Assignment documents were reissued on an annual basis and that the terms of Plaintiff's Feltwell Field Assignment document would continue only with the issuing of a renewed document, which did not occur. Accordingly, there is a genuine issue of material fact as to whether the alleged Field Assignment contract terminated on September 30, 1994, or continued in effect for the duration of Plaintiff's tenure at the Feltwell, England, site. Accordingly, as discussed, *infra*, to the extent that Plaintiff's breach of contract claims are based on Defendant's conduct occurring on or after October 1, 1994, there are genuine issues of material fact as to whether a contract existed at that time. Accordingly, Plaintiff's Motion for Summary Judgment on those claims (portion of Count One, and all of Counts Two, Three, and Four) is OVERRULED.

### 2. Failure to Perform the Contract by GTE Government

As stated, *supra,* Plaintiff alleges that GTE Government breached the alleged Field Assignment contract by failing to pay standby pay, and by reducing his field premium and housing allowance. Plaintiff asserts that he is entitled to summary judgment on each of these claims. Defendant contests this assertion, and argues that it is entitled to summary judgment on Plaintiff's standby pay claims.[11]

### a. Standby Pay Claims (Counts One and Two)

 Plaintiff alleges that Defendant breached the Field Assignment document, when it failed to pay him for the time that he was listed on the on-call back-up list. Plaintiff notes that he was continually listed on the bottom of the standby roster, in the section for on-call backup. He argues that this was a form of on-call status, which entitled him to on-call or standby duty pay. GTE Government responds

---

mated date had passed on the field assignment form?

A: That was a field office responsibility, yes.

**10.** As discussed, *infra,* whether the alleged Field Assignment document terminated on September 30, 1994, is critical to whether Plaintiff is entitled to summary judgment on his breach of contract claim, based on the reductions of his field premium and housing allowance. Because Defendant has not sought summary judgment on that claim,

Plaintiff is the sole moving party on that issue. Thus, the Court will construe the evidence in the light most favorable to Defendant, the non-moving party, with regard to the issue of the term of the alleged contract.

**11.** Although Defendant opposes Plaintiff's Motion for Summary Judgment on the breach of contract claims, based on the reductions in the field premium and housing allowance, GTE Government has not sought summary judgment on those claims.

that the Field Assignment document does not address being paid for carrying a beeper or being paid for being on the on-call backup list. Specifically, Defendant notes that the Standby time section of the Field Assignment document states:

Required standby time worked will be paid at the rate of 25% of the actual hours on standby.

(Example: If on standby for 24 hours, the employee will be paid for 6 hours) If "Call In" from stand-by or off duty hours, the employee will be paid a minimum of one hour for responding per "Call In". Any time charged to the "Call In" beyond the one hour must be actual hours worked. For the purpose of computing stand-by pay when a "Call–In" has been effected, the actual "Call–In" hours charged are deducted from the total actual standby hours.

(Example: 24 actual stand-by hours—2 "Call–In" hours worked = 22 hours of actual standby subject to be paid at 25%)

Reimbursement for this purpose will be paid for all hours worked.

(Pl.'s Vol. I Depo., Ex. 8). GTE Government asserts that Plaintiff was not on standby time when he carried a beeper and was listed on the on-call backup list. Thus, the alleged contract did not provide for any payment of standby pay to him.[12]

Whether Plaintiff was entitled to standby pay while he carried a beeper and was listed on the on-call backup list is dependent upon whether on-call backup status is a form of standby status. The parties vigorously contest the distinctions between standby duty status, on-call status, and on-call backup status. According to Plaintiff,

standby time, on-call time and on-call backup are synonymous terms (Doc. # 55 at 8). Plaintiff has noted that other documents issued by GTE Government do not refer to "standby duty" but, rather, refer to "on-call" status. *See* Pl.'s Depo. Vol. I (Supervisor's Personnel Handbook); Vanover Depo., Ex. 3. As with individuals on standby duty, individuals who were designated as on-call backup were required to carry the beeper and needed to be responsive by telephone and could be called into work (Pl.'s Depo. at 44–49; Vanover Depo. at 78). Mr. Vanover was told that, while on on-call backup, he needed to respond within thirty (30) minutes (*id.* at 83). Mr. Vanover further testified that, while he was at the San Vito site in Italy, on-call and on-call backup were compensated at the same rate: one hour of pay for every four hours on-call (Vanover Depo. at 77). Plaintiff further indicates that the document listing the employees on standby duty could be referred to as either the standby duty roster or the on-call schedule; the terms are "one and the same." (Russell Depo. Vol. I at 58).

Defendant contends that on-call backup status was not synonymous with standby status. It argues that individuals on the on-call backup list could freely travel beyond 45 minutes away from the Feltwell site, they could consume alcohol, and they were not required to report to the site if they had consumed alcohol or were not available, because they had traveled too far from Feltwell (Grubb Decl. p. 6–7). Plaintiff acknowledged that employees who were on designated standby duty could not drink alcoholic beverages and had to stay within 45 minutes of the site (Pl.'s Depo.

---

12. GTE Government notes that Plaintiff was on standby duty (as defined by that entity), between June of 1996 and September 30, 1998. It further notes that Plaintiff was paid for all standby duty hours in accordance with the Field Assignment document that he signed. Plaintiff has not disputed this assertion, and the Court notes that Plaintiff's claim for unpaid standby duty pay does not include the time period that he was listed on the standby roster.

Vol. 1 at 39–40). He further acknowledged that when he appeared on the standby schedule, but was not the designated standby person, he could consume alcohol and travel in excess of 45 miles from the site, as long as he told the site manager that such was going to be the case (*id.* at 158–59). In addition, GTE Government notes that individuals who were on the standby duty list were contacted much more frequently than those on the on-call backup list. Plaintiff testified that those on the standby duty list were contacted, on average, at least once every week (Russell Depo. Vol. I at 151–52). In contrast, Plaintiff indicated that every one to two months, he would be called while on the on-call backup list, and would be able to handle the problem via the telephone. In addition, every one to two months, he would be called from the on-call backup list and have to go to the site. (Russell Depo. Vol. I at 147–49). Defendant further notes that Plaintiff was treated the same as all other Feltwell employees who carried a beeper and who were on the on-call backup list. (Grubb Decl. p. 8). Mr. Vanover testified in his deposition that he likewise was not paid for the time when he was on the on-call backup list and was required to carry a beeper (Vanover Depo. at 77–80).

■ Upon review of the evidence, the Court concludes that there are genuine issues of material fact which preclude summary judgment in favor of either Plaintiff or Defendant. The Field Assignment document refers to payment for time spent on "standby," but if fails to provide a definition of that term. Both parties ascribe different definitions to that term, and the Court likewise finds that the term is ambiguous. "Once the court has determined that the contract is ambiguous, the interpretation of the contract becomes a question of fact." *Dorman v.*

*Petrol Aspen, Inc.,* 914 P.2d 909, 918, n. 1 (Colo.1996). Having determined that the term "standby" is ambiguous, the Court further concludes that both parties have presented reasonable definitions for that term. Plaintiff has provided evidence that on-call backup employees were required to carry beepers and be responsive within 45 minutes, and that, at other sites, on-call backup employees were compensated identically to on-call or standby employees. Accordingly, construing the evidence in the light most favorable to Plaintiff, a reasonably jury could conclude that on-call backup status was a subset of on-call or standby status. However, Defendant has provided evidence that individuals with on-call backup status did not have the same level of restrictions as those on standby duty, and did not have their off-duty hours interrupted with the same frequency as standby duty employees. Accordingly, construing the evidence in the light most favorable to Defendant, a reasonable jury could conclude that on-call backup was a different status, which did not receive compensation as standby pay. Accordingly, both Plaintiff's and Defendant's Motions for Summary Judgment on Plaintiff's breach of contract claims, based on the failure to pay standby duty pay (Counts One and Two), are OVERRULED.

b. *Field Premium and Housing Allowance Reductions (Counts Three and Four)* [13]

Plaintiff asserts that GTE Government breached the Field Assignment document when it reduced his housing allowance on October 1, 1995, and reduced his field premium on January 1, 1995. As discussed, *supra*, the Court concludes that there is a genuine issue of material fact as to whether the alleged contract expired on Septem-

---

**13.** As stated, *supra*, Plaintiff is the sole moving party with respect to these claims.

ber 30, 1994. Accordingly, there is likewise a genuine issue of material fact as to whether Defendant breached that alleged contract when it reduced Plaintiff's field premium and housing allowance subsequent to that date. Plaintiff's Motion for Summary Judgment on his breach of contract claims, based on the reductions in his field premium and housing allowance, is OVERRULED.

## C. *Promissory Estoppel Claims*

 In Counts Five and Six of his Amended Complaint, Plaintiff has set forth claims for promissory estoppel, based on Defendant's failure to pay full joint travel regulation ("JTR") lodging and meals and incidental expenses ("M & IE") for Plaintiff and 50% of his dependents (Count Five), and its failure to abide by promises in the Field Assignment document (Count Six). In *Kiely v. St. Germain*, 670 P.2d 764, 767 (Colo.1983), the Colorado Supreme Court adopted the principles articulated by section 90(1) of the Restatement of Contracts regarding promissory estoppel. That section provides:

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

Restatement (Second) of Contracts § 90(1). "The doctrine of promissory estoppel encourages fair dealing in business relationships and discourages conduct which unreasonably causes foreseeable economic loss because of action or inaction induced by a specific promise." *Kiely*, 670 P.2d at 767; *Cassidy v. The Millers Casualty Ins. Co. of Tex.*, 1 F.Supp.2d 1200, 1212–13 (D.Colo.1998). Thus, under Colorado law, the elements of a promissory estoppel claim are: (1) the promisor made

a promise to the promisee; (2) the promisor should reasonably have expected that the promise would induce action or forbearance by the promisee; (3) the promisee reasonably relied on the promise to the promisee's detriment; and (4) the promise must be enforced to prevent injustice. *Berg v. State Board of Agriculture*, 919 P.2d 254 (Colo.1996); *Lutfi v. Brighton Community Hosp. Ass'n*, 40 P.3d 51, 59 (Colo.Ct.App.2001). An employer may be liable under a promissory estoppel theory where: 1) the employer should reasonably have expected its employee to consider its policy to be a commitment or promise; 2) the employee reasonably relied on that promise to his or her detriment; and 3) injustice can be avoided only by enforcing the promise. *Shaw v. Sargent Sch. Dist. No. RE–33–J*, 21 P.3d 446, 448 (Colo.Ct. App.2001), citing *Continental Air Lines, Inc. v. Keenan*, 731 P.2d 708 (Colo.1987) and Restatement (Second) of Contracts § 90 (1981). The Court notes that promissory estoppel is only available as a remedy in the absence of an otherwise enforceable contract, express or implied. *Scott Co. v. MK–Ferguson Co.*, 832 P.2d 1000 (Colo.Ct. App.1991). Where an employer's written policy provides the basis for an implied contract claim, the doctrine of promissory estoppel is inapplicable. *Bellairs v. Coors Brewing Co.*, 907 F.Supp. 1448, 1455 (D.Colo.1995).

1. *On–Call Backup Pay, Field Premium, and Housing Allowance Promises (Count Six)*

With regard to Count Six, Plaintiff alleges that GTE Government made a series of promises, which induced him to go to the Feltwell, England, site. He alleges that Defendant promised to pay him a 15% field premium and a certain housing allowance, and that Defendant broke those promises when it unilaterally reduced both of those amounts. Plaintiff further con-

tends that Defendant violated its promises when it required him to carry a beeper at all times without compensation, unless he was on the standby duty schedule. In his Motion for Summary Judgment, Plaintiff states that he detrimentally relied upon the promises in the Field Assignment document in moving to England, as employees and their families incur numerous hardships for agreeing to come to an overseas site. Plaintiff indicates that, but for Defendant's inducements and promises, he would not have accepted the position in England.

In its Motion, Defendant argues that it is entitled to summary judgment on Plaintiff's claim on a number of grounds. *First,* GTE Government asserts that Plaintiff cannot demonstrate that he received a Field Assignment document for the Feltwell site on or before October 1, 1993, when he arrived in Feltwell. *Second,* Defendant asserts that it never made a "clear and unambiguous" promise that he would receive standby pay for carrying a beeper and being on the on-call backup list at Feltwell. *Third,* Defendant argues that, lacking a clear and unambiguous promise, Plaintiff could not have reasonably relied to his detriment on any standby pay promise when he accepted the Feltwell assignment.

■ As an initial matter, the Court notes that Plaintiff's memorandum states that GTE Government's promises were made via an August, 1993, Field Assignment document, which neither party executed (Doc. # 55 at 2; Doc. # 63 at 8). Although Plaintiff notes, as part of his choice of law argument, that he had numerous conversations with Mr. Sprague and Ms. Yaksick regarding the terms of his future assignment in England, he does *not* assert, in his memorandum, that those conversations form the basis for his promissory estoppel claim.[14] In addition, Plaintiff notes in his Opposition Memorandum that Ms. Molvar issued a memorandum on February 22, 1993, which set forth a uniform policy for individuals "who [are] designated to be available through some form of communication (beeper, telephone) to respond to unscheduled call in to work, and whose movements are restricted by the need to be immediately responsive during their call in period...." (Vanover Depo., Ex. 3). However, he likewise does not cite to that policy during his discussion of his promissory estoppel claim. Accordingly, the Court will consider only the unsigned, August, 1993, Field Assignment document as the basis for that claim.[15]

■ Turning to Defendant's three arguments in support of its Motion, Defendant's first argument (*i.e.,* that Plaintiff

---

14. In his deposition, Russell articulated his claim as follows:

> Q: So at that point in time before you accepted your Feltwell position, the only form the promises were in was in the conversations you had with Joyce Yaksick?
> A: Well, actually, the conversations I had with Joyce Yaksick, which were reduced to paper in Exhibit 8 [the April, 1994, Field Assignment document] and then provided to me for my signature with the signatures of the program management.

(Russell Depo. Vol. III at 39–40).

15. Even if the Court were to consider the conversations with Ms. Yaksick and the policy

as bases for Plaintiff's promissory estoppel claim, Defendant would still be entitled to summary judgment. Ms. Yaksick's alleged promise to pay standby duty pay is not a clear and unambiguous promise. As discussed, *supra,* the term "standby" has been ascribed numerous reasonable meanings by GTE Government employees. As for the February, 1993 policy, Plaintiff has not provided evidence that he was aware of the policy prior to relocating to Feltwell, England. Nor has Plaintiff provided evidence that he relied upon that policy when deciding whether to relocate.

cannot demonstrate that he received a Field Assignment document for the Feltwell site on or before October 1, 1993) is dispositive. Plaintiff cannot reasonably rely upon a document which he did not receive prior to accepting the Feltwell assignment. See *Kuta v. Joint District No. 50(J) of the Counties of Delta, Gunnison, Mesa and Montrose*, 799 P.2d 379, 383 (Colo.1990) (teachers could not detrimentally rely on a reduction in force policy of which they were unaware); *Lutfi v. Brighton Comm. Hosp. Ass'n*, 40 P.3d 51, 59 (Colo.Ct.App.2001) (plaintiff did not establish his reliance upon the hospital's bylaws; "the record indicate[d] that it was not until after he lost his ER position that he looked to the bylaws to see if they contained provisions on physician removal that might strengthen his claim against the hospital."); *Kiely*, 670 P.2d at 767. Herein, Plaintiff's deposition testimony does not establish that he received the August, 1993, Field Assignment document prior to accepting the position in England. Initially, Plaintiff stated that he did not recall when he received that document, although it may have been while he was still in Italy (Russell Depo. Vol I at 118). He subsequently indicated that he did not know when he received that Field Assignment document (*id.* at 126; Russell Depo. Vol. II at 336). Although he has testified that the April, 1994, Field Assignment document memorialized the promises made to him by Ms. Yaksick and Mr. Sprague while he was in Italy (Russell Depo. Vol. III at 39–45), he has provided no evidence that he received the August, 1993, Field Assignment document prior to accepting his position in England, and that he relied upon those promises. Accordingly, Plaintiff could not have reasonably relied on that document when he decided to take the Feltwell assignment. Accordingly, Defendants are entitled to summary judgment on Plaintiff's promissory estoppel claim, which is based on promises made in the August, 1993, Field Assignment document. Its Motion for Summary Judgment on this promissory estoppel claim is SUSTAINED, and Plaintiff's Motion for Summary Judgment on same is OVERRULED.

### 2. Joint Travel Regulation ("JTR") Lodging and Meals and Incidental Expenses ("M & IE") (Count Five)

■ GTE Government asserts that the Court should overrule Plaintiff's Motion for Summary Judgment on his promissory estoppel claim, based on the failure to pay certain JTR lodging and M & IE for his dependents. It argues that there are genuine issues of material fact as to whether a clear and unambiguous promise was ever made. In addition, Defendant asserts that it is entitled to summary judgment on that claim, because Plaintiff did not rely on any promise to his detriment. The Court agrees that no detrimental reliance has been demonstrated.

In his Motion, Plaintiff asserts that, in order to prevent being the victim of "guzumping",[16] he wanted to sell his home in July before the end of the project and before the Feltwell site closed. He alleges that he spoke with Mr. Vanover, who was the site manager for the closeout of the contract, and he was promised that he would received full JTR and M & IE for himself and one-half JTR and full M & IE for his dependents, provided that Plaintiff would stay through the conclusion of the contract.[17] Plaintiff contends that had he

---

**16.** Plaintiff indicates that "guzumping" occurs when the houses on the market are sold below market value as the local people realize that the owners have to sell and, therefore, they do not pay market value for the homes.

**17.** In his deposition, Plaintiff states that he was promised full JTR and M & IE for himself, and one-half JTR and M & IE for his dependents (Russell Depo. Vol. II at 362).

"known that he was not going to be compensated for staying through the conclusion of the contract as promised, he would have left in August." (Doc. # 55 at 12). He further stated that when GTE Government breached its promise to pay full JTR and M & IE for himself and one-half JTR and full M & IE for his dependents, he suffered to his detriment (*id.*). In his deposition, Plaintiff indicated that, but for Mr. Vanover's promises, he would have left England in time to get his children enrolled in a new school before the school year began.

In response, Defendant has provided evidence, demonstrating that Plaintiff's decision to sell his house early was not influenced by any alleged compensation package, and that the failure to receive his requested JTR and M & IE did not result in any injury. Plaintiff sold his home and moved into a hotel on July 13, 1998 (Russell Depo. Vol. I at 242). According to correspondence written by Plaintiff on September 23, 1998, to Mr. Steven Kritzman, Defendant's Director of Human Resources, Plaintiff conferred with Mr. Vanover on July 16, 1998, regarding his desire to depart Feltwell, England, for Dayton, Ohio, to begin employment on August 1, 1998 (Russell Depo. Vol. II, Ex. 30). Thus, Plaintiff's decision to sell his home and to move into a hotel occurred prior to the issuance of Mr. Vanover's alleged promise.

Although Plaintiff indicates in his correspondence that he wished to commence employment in Dayton on August 1, 1998, that employment was with Defendant. Plaintiff did not receive that position, because GTE Government would not let employees from Feltwell transfer to other positions within the company prior to October 1, 1998. (Russell Depo. Vol. II at 455) Plaintiff has provided no evidence that he declined any employment with another company as a result of Defendant's alleged promises regarding JTR and M & IE.[18]

In addition, Plaintiff has not provided evidence that he suffered any financial loss due to the alleged breach of Mr. Vanover's promise. Plaintiff indicated that his hotel expenses were 35£ (approximately $60), while his requested per diem for that housing was $149 for himself and $298 for his dependents. Thus, it is clear that the amount that he sought for housing (a total of $447 for himself and his dependents) far exceeded his expenses (Russell Depo. Vol. II at 472–73). The evidence further demonstrates that the per diem which Plaintiff received for his housing alone exceeded the costs for himself and his children. Thus, there is no evidence that Plaintiff suffered any financial loss due to Defendant's alleged failure to pay one-half JTR for his children. In his deposition, Plaintiff indicated that he was promised one-half JTR and M & IE for his dependents (Russell Depo. Vol. II at 362). The evidence indicates that he received 50% M & IE for his dependents, as promised. (Russell Depo. Vol. II, Ex. 47). In addition, Defendant has provided evidence that Plaintiff received a lump sum retention bonus of $12,554.00 in exchange for staying on the ATLAS project until its completion. In summary, although he did not receive 50% JTR lodging for his dependents, he did not forego any job opportunities, and he did not suffer any financial losses. In light of the foregoing, the Court concludes that Plaintiff has failed to create a genuine issue of material fact that he suffered a

---

**18.** Plaintiff received correspondence from Ms. Karen Ulen, ATLAS Program Manager, dated August 20, 1998, in which she indicated that Plaintiff's dependents would not receive 50% JTR (Russell Depo. Vol. II, Ex. 30). Plaintiff provided no evidence that he had any offers of employment from other companies prior to that time.

detriment when he relied on Mr. Vanover's alleged promises. Plaintiff's Motion for Summary Judgment on his promissory estoppel claim, based on Mr. Vanover's alleged promises in July of 1998, is OVERRULED, and Defendant's Motion for Summary Judgment on that claim is SUSTAINED.

### D. *GTE Government's Affirmative Defenses*

In its Motion, Defendant asserts that it has numerous affirmative defenses to Plaintiff's claims, which require a grant of summary judgment in its favor. In particular, Defendant raises the defenses of acquiescence, waiver, and estoppel. In addition, Defendant asserts that Plaintiff and GTE Government entered into a consensual variation or novation of the alleged contract.

 Acquiescence exists "where a person knows or ought to know that he is entitled to enforce his right or to impeach a transaction, and neglects to do so for such a length of time as would imply that he intended to waive or abandon his right." Black's Law Dictionary at 24, citing *Yench v. Stockmar*, 483 F.2d 820, 823 (10th Cir. 1973) (applying Colorado law). Waiver is the intentional and voluntary abandonment of a known right. *Gulf Ins. Co. v. State of Colorado*, 43 Colo.App. 360, 607 P.2d 1016, 1019 (1979); *Colorado Bank & Trust Co. v. Western Slope Investments, Inc.*, 36 Colo. App. 149, 539 P.2d 501 (1975). As recently discussed by the United States District Court for the District of Colorado:

> "Waiver is the voluntary abandonment or surrender by competent persons of a right known by them to exist, with the intent that such right shall be surrendered and such persons be forever deprived of its benefits." *See Colorado Bank & Trust Co. v. Western Slope Investments, Inc.*, 36 Colo.App. 149, 539 P.2d 501, 503 (1975). In Colorado, for a

waiver to exist, there must be a clear, unequivocal, and decisive act of the party showing such a purpose. *See id.* A contracting party's silence is almost always insufficient to create a waiver of a contractual right. *See, e.g., Universal Resources Corp. v. Ledford*, 961 P.2d 593, 596 (Colo.App.1998). Waiver of a contractual right also requires "full knowledge of all the relevant facts" and may be explicit, as when a party orally or in writing abandons an existing right or privilege, or it may be implied, as when a party engages in conduct which manifests an intent to relinquish the right or privilege or acts inconsistently with its assertion. *See Johnson v. Industrial Commiss'n of the State of Colo.*, 761 P.2d 1140, 1147 (Colo.1988). *Intelligent Electronics, Inc. v. Digital Origin, Inc.*, 2000 WL 680359, *12 (D.Colo. May 22, 2000).

Colorado courts have applied waiver and acquiescence to preclude recovery for breach of contract. Almost one hundred years ago, the Supreme Court of Colorado applied these principles in *Taylor v. Thomas*, 31 Colo. 15, 71 P. 381 (1903). Therein, four lessees jointly operated a mine, pursuant to an agreement among the parties. On January 21, 1898, the parties modified their agreement, whereby two of the lessees (defendants) were to operate the mine, pay all expenses, and divide the profits with their co-lessees (plaintiffs). After the modification, the defendants each held a three-eighths interest in the mine, while the plaintiffs each held a one-eighth interest. The two defendants also entered into a separate contract with the Big Four Mining Company, by which they acquired the right to carry on work in the mine through the workings of that company. In accordance with the terms of the lease, the defendants furnished to the plaintiffs monthly itemized statements of account and, upon the termination of the lease, a

final accounting, which indicated business done during the lifetime of the lease. Between January and September of 1898, the lessees suffered losses from the mine's operation. In October, November, and December of 1898, the mine showed sufficient profit to offset the prior losses to date. From December, 1898, until the lease terminated, the mine yielded a net profit. The plaintiffs signed receipts acknowledging payment of different sums of money from time to time, and they never made demand on the defendants for additional sums during the life of the lease. After the conclusion of the lease, the plaintiffs brought suit against the defendants for, *inter alia*, the amount of the excess expenses over the receipts up to the September 1, 1898.

In their lawsuit, the plaintiffs argued that the January 21st contract provided that any losses should be borne by the defendants alone. They contended that the lease was divided into monthly periods and that for the purposes of ascertaining profits, the defendants should have looked at each month separately. Upon consideration of the language of the agreement, the Colorado Supreme Court rejected the plaintiff's argument. It further stated that the plaintiffs had objectively given the contract that same construction as defendants, noting that the plaintiffs had been provided statements of account, had received and cashed the checks for their share of the profits, and had not objected until after the lease was surrendered. The Court precluded the plaintiffs from recovering, reasoning:

> It is entirely clear that plaintiffs knew the construction which defendants put upon the contract when these statements, covering a period of nearly two years, were received by them, and they never objected thereto until after a lapse of an unreasonable time. As a matter of law, it would seem that plaintiffs ought not now to be heard to insist upon an-

other meaning. Their long silence is not justified by showing (and this is their only excuse) that under advice of counsel they deferred objection until after the termination of the lease, because they feared that, if sooner made, litigation would result, or the work stop, or the lease be thrown up. Fair dealing required that their objection be made within a reasonable time after the accounts were rendered, so that plaintiffs, if such a construction as plaintiffs now insist on was to govern, might elect to stop work which the agreement permitted.

71 P. at 384; *see also Boulder Co. v. Poor,* 497 P.2d 1281, 1283 (Colo.Ct.App.1972) (failure of sellers of real estate to deliver the title commitment within the 30 day period, as required by the contract of sale, did not constitute a breach of the contract. "The buyer accepted the late delivery of the title insurance commitment without objection and there is no evidence that either party gave any significance to this issue. This conduct constituted waiver of the breach as a matter of law."); *Seale v. Bates,* 145 Colo. 430, 359 P.2d 356, 358 (1961) (acceptance by students of the assignment of their dance lessons to another dance studio by proceeding to take lessons from the assignee studio constituted a waiver of the breach of contract, caused by the wrongful assignment).

### 1. *Standby Duty Pay*

 Turning to Plaintiff's claims for standby pay, Defendant asserts that Plaintiff acquiesced in Defendant's failure to pay him for the time he wore a beeper and was listed on the on-call backup list. Plaintiff has responded that his failure to protest is not evidence that he agreed that he should not have been paid for the time that he was on such list. He notes that an individual has a duty to mitigate damages, and that he would have been terminated

had he complained. He argues that his silence was appropriate, because he had already moved his family to England and purchased a house. He states that refusal to wear a beeper would have put his career in jeopardy.

According to Plaintiff's deposition testimony, after he was informed by Mr. Grubb that he would be required to wear a beeper at all times but would not be paid for being on the on-call backup list, Plaintiff believed that non-payment would constitute a breach of contract. (Russell Depo. Vol. III at 47). Despite that belief, Plaintiff did not complain to management about Defendant's decision not to pay him for on-call backup time (*id.*). On April 8, 1994, Plaintiff signed his Field Assignment, which indicated that Plaintiff would receive standby pay for required standby time. Using its definition of "standby," GTE Government paid Plaintiff during the time he was on the standby duty roster, but not on the on-call backup list. Between November of 1993 (when he was told he would be required to wear a beeper) and September of 1998 (when his employment ended), Plaintiff never requested a government charge number for standby pay for the time when he was on the on-call backup list, nor did he seek compensation for that time in any other manner. Thus, the evidence indicates that, for five years, Plaintiff received pay checks from GTE Government as compensation for his work performance at the Feltwell site, without providing any indication to Defendant that the pay checks were inaccurate, despite his continual belief that a breach of contract was occurring.

■ Although this evidence may support a factual conclusion that Plaintiff acquiesced in and waived GTE Government's alleged breach of contract, the Court cannot conclude, as a matter of law, that acquiescence or waiver occurred and, thus, that Plaintiff is estopped from bringing his claims. According to Plaintiff's testimony, at the time that he was given his beeper, Ms. Grubb specifically informed him that he would not be paid for the time that he was listed on the on-call backup list. Thus, a reasonable jury could conclude that it would be a futile gesture to request a government charge number for that time or to include that time on his timecards. In addition, silence or inaction typically is "deemed acceptance of an offer only when the relationship between the parties is such that an offeror is justified in expecting a reply or the offeree is under a duty to respond." *Haberl v. Bigelow*, 855 P.2d 1368, 1374 (Colo.1993). In other words, a person receiving a proposal to change an agreement generally is not obligated to answer the proposal. *Id.* Plaintiff's failure to act and to complain to management, in these circumstances, could be construed as mere silence, which is generally insufficient, by itself, to demonstrate waiver or acquiescence.[19] Accordingly, the Court concludes that there is a genuine issue of material fact as to whether Plaintiff acquiesced in GTE Government's alleged breach and waived his right to enforce the terms of the alleged contract. Defendant's Motion for Summary Judgment on Plaintiff's standby duty breach of contract claims, based on acquiescence and waiver (Counts One and Two) is OVERRULED.

**19.** Although the Court concludes that a genuine issue of material fact exists, it notes that Plaintiff's assertion that he had a duty to mitigate damages does not support his position that his silence was reasonable. The damages that Plaintiff seeks to recover are the unpaid standby duty pay for the time that he was on the on-call backup list. Those damages could only be mitigated by seeking to be compensated for that time in a timely manner, not by waiting until his employment had ceased.

■ With regard to Plaintiff claims that he should be paid for the time he was on the on-call backup list during the time period September of 1996 to October of 1998 (Count Two), Defendant further argues that Plaintiff agreed that he should not be paid standby duty pay, because he signed his time cards and time sheets, thereby certifying and agreeing that he should not be paid for on-call backup time. The evidence supports Defendant's position.

Plaintiff testified that, beginning in June of 1996, GTE Government altered the time card system, whereby time cards were kept electronically in a Microsoft Excel spreadsheet (Russell Depo. Vol. I at 163). On a weekly basis, the site administrator would print out the spreadsheet, and take it to each employee to check for accuracy and to sign (*id.* at 164). Plaintiff further testified that by signing the printout, he was certifying that the hours he was being paid for that particular week was correct (*id.* at 163). Defendant further indicates that Plaintiff never requested a government charge number for standby pay for the time when he was on the on-call backup list. Plaintiff has not provided any evidence to the contrary. By certifying the accuracy of his timecards, Plaintiff made affirmative statements to Defendant which contradicted his belief that GTE Government owed him payment for on-call backup time. Accordingly, based on Defendant's uncontroverted evidence, the Court concludes there is no genuine issue of material fact that Plaintiff is estopped from contesting GTE Government's failure to pay his standby duty pay, subsequent to June of 1996. Defendant's Motion for Summary Judgment on Count Two is SUSTAINED on this basis.

2. *Field Premium and Housing Allowance*

As with the standby pay claims, Defendant asserts that Plaintiff's breach of contract claims, based on the changes to his field premium and housing allowance, are barred due to Plaintiff's acquiescence. As an alternative argument, Defendant contends that Plaintiff agreed to the reductions in exchange for continued employment through novation.

■ A novation extinguishes a previously existing contract by substituting a new contract or obligation. *Phoenix Power Partners, L.P. v. Colorado Public Utilities Comm'n,* 952 P.2d 359, 364 (Colo. 1998); *Moffat County State Bank v. Told,* 800 P.2d 1320, 1323 (Colo.1990). There are four requirements for a novation: (1) a previous, valid contract, (2) agreement between the parties to abide by the new contract, (3) a valid new contract, and (4) extinguishment of the old contract by substitution of the new one. *Id.* The parties need not expressly manifest their intent to accomplish a novation, but a novation may be inferred from the facts and circumstances surrounding the transaction. *Id.*

■ In its Memorandum (Doc. # 60), Defendant argues that Plaintiff took no action to complain about GTE Government's alleged breaches after it reduced the field premium and housing allowance. In addition, it has provided evidence that Plaintiff received a memorandum, dated November 1, 1994, from Mr. Don Littler, in which Plaintiff was informed (1) effective January 1, 1995, the field premium would be reduced from 15% to 10%; and (2) in October, 1995, the computation of overseas housing allowances would be performed in strict accordance with the Department of State Publications (Russell Depo. Vol. II, Ex. 36A). The memorandum further recognized that "these changes may have an impact on [an employee's] decision to stay in the field." Thus, Mr. Littler indicated that every employee would have an opportunity to decide whether he chose to accept the terms

of the new policy and continue his job on site, or whether he chose to return to his home base location. (*Id.*) Plaintiff indicated in his deposition that he did not find either choice acceptable; however, he elected to stay with GTE Government (*id.* at 421). Defendant asserts that Plaintiff signed a document accepting the changes, in exchange for up to three years of continued employment. Plaintiff has provided no evidence that he expressed his dissatisfaction with the changes in benefits to management, or indicated to Defendant that he had not accepted the terms of the new policy. Plaintiff continued to work for and receive payment from GTE Government under the terms of the new policy, without complaint, until September of 1998, a period of almost four years.

Although Defendant asserts that Plaintiff signed a document accepting the reduction in the field premium and the housing allowance, so that he could continue to be employed with GTE Government for up to three additional years (Doc. # 60 at 49), Defendant has failed to present that document. Accordingly, Defendant has not established that a novation thereby occurred, and that Plaintiff expressly agreed to reduced benefits in exchange for continued employment.

As for Plaintiff's acquiescence, it is undisputed that Plaintiff elected to remain overseas and to continue working at the Feltwell site. However, assuming that a breach of contract occurred, there is a genuine issue of material fact as to whether Plaintiff's actions constitute mere silence or tacit acceptance of the change in benefits. Accordingly, Defendant has not established that it is entitled to summary judgment on Plaintiff's breach of contract claims, based on its affirmative defenses. Defendant's Motion for Summary Judgment on Plaintiff's claims, based on the reduction in his housing allowance and field premium, is OVERRULED.

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Doc. # 55) is OVERRULED, and Defendant's Motion for Summary Judgment (Doc. # 60) is OVERRULED IN PART AND SUSTAINED IN PART. As a result of the rulings herein, the following claims are dismissed: (1) Plaintiff's promissory estoppel claims (Counts Five and Six); (2) Plaintiff's breach of contract claims, based on the August 20, 1993, Field Assignment document; and (3) his claim for breach of contract, based on standby duty pay between June of 1996 and September of 1998 (Count Two). Remaining are Plaintiff's breach of contract claims, based on an oral contract and the written April, 1994, Field Assignment document, for failure to pay standby pay (Count One), the reduction in the field premium (Count Three), and the reduction in the housing allowance (Count Four). Defendant's Counter Claim for attorney fees and costs also remains.

Counsel listed below will take note that a telephone conference call will be held, beginning at 8:30 a.m., on Wednesday, September 18, 2002, for the purpose of resetting a trial date and other dates leading to the resolution of this litigation.